# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SCOTT JOHNSON, as personal representative of
the estate of GRACIELA CANO a/k/a GRACE
LEE BOGEY, deceased, and LORENA TORREZ,

      Plaintiffs,

vs.                                                                       No. CIV-02-1239 JB/KBM

ANNE HOLMES, BONNIE VEHSTEDT,
KAREN ZARATE, LYDIA R. SAENZ, SONIA
PEREZ, VIRGINIA VILLAREAL, VIVIAN ENCINIAS,
GINGER BOWMAN, DENISE H. NAVAEZ,
JANE DOE, and JOHN DOE in their individual
capacities, the NEW MEXICO CHILDREN, YOUTH
AND FAMILIES DEPARTMENT, TERRY BOGEY,
a/k/a TERI BOGEY, and VERONICA BOGEY,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Partial Summary

Judgment on Liability Against Defendant Veronica Bogey, filed July 17, 2003 (Doc. 78). The

primary issues are: (i) whether Veronica Bogey ("Bogey") is a state actor for purposes of alleging

a constitutional violation; and (ii) whether Bogey has presented evidence sufficient to survive

summary judgment on whether she wrongfully caused the Plaintiff decedent's death. The Court finds

that Veronica Bogey is not a state actor for purposes of alleging a constitutional violation and that

Bogey has not created a genuine issue of material fact whether she wrongfully caused Graciela Cano

a/k/a Grace Bogey's ("Grace") death. The Court will, therefore, deny the Plaintiff Scott Johnson's

motion in part and grant it in part. The Court will grant summary judgment in favor of Bogey on

Count III and enter summary judgment against Bogey on liability on Count VIII.

## FACTUAL BACKGROUND

On January 2, 1998 the New Mexico Department of Children, Youth and Family Services ("CYFD") obtained physical custody of Graciela Cano a/k/a Grace Bogey ("Grace"), a special needs child born with Spinabifida to Plaintiff Lorena Torrez on July 15, 1997.  See New Mexico Citizen Review Board Project, "Recommendations" at 1 (March 30, 1999); Request for Termination of Parental Rights.  Torrez relinquished her parental rights on March 15, 1999 to allow for Grace's adoption.  See In the Matter of Stephanie Torrez, Amanda Hernandez, and Graciela Cano, and Concerning Lorena Torrez, Eladio Hernandez, and Jesus Cano, Respondents, Relinquishment of Parental Rights and Consent to Adoption (In the Children's Court, Third Judicial District Court, County of Dona Ana, State of New Mexico, filed March 15, 1999).

CYFD licensed Defendant Veronica Bogey ("Bogey") as a potential adoptive parent on or about May 18, 1999, subject to annual recertification.  See Deposition of Denise H. Narvaez at 17:22-19:11 (taken June 6, 2003); Annual Recertification / Homestudy Update (May 17, 2000). See also §§ 8.26.2.16, 8.26.3.18 NMAC.  As part of the licensure process, CYFD provided Bogey with thirteen hours of training.  See Deposition of Sonia Perez Sanchez at 12:25 to 13:13 (taken June 6, 2003).  CYFD paid Bogey a monthly stipend of $487.00 for Grace's care.  See In the Matter of the Adoption Petition of Graciela Monique Cano, Post Placement Court Report at 2 (Fifth Judicial District, County of Chaves, State of New Mexico)(June 6, 2000)("The New Mexico Children Youth and Families Department is providing the petitioner with a monthly subsidy in the amount of $487.00, which is negotiated on a yearly basis until the child reaches the age of eighteen.").  CYFD also paid for miscellaneous expenses Bogey incurred before the adoption and legal fees in the amount of $350 Bogey incurred during the adoption proceedings.  See id.  The placement agreement reserved to

CYFD the right to supervise Grace before the adoption's finalization, and authorized Bogey to exercise the usual parental rights and responsibilities.  See Agreement of Adoptive Placement at 1.

In January 2000, Kerstin Lagestam began to provide health care for Grace as a registered nurse working for Advanced Home Health Care in Roswell, N.M.  See Affidavit of Kerstin Lagestam ¶ 2, at 1 (executed May 28, 2003).  When Lagestam first went to the Bogey home to care for Grace, she "noticed some swelling and a large purple bruise on the left side of Grace's face.  Veronica told [her] that she accidently struck Grace's face on the car door as she was lifting her out of the car."  Lagestam Aff., ¶ 3, at 2.[1]

In March 2000, Lagestam noticed a series of injuries to Grace, including scratches on her neck, back, and abdomen, and a bruised and swollen right hand.  See Lagestam Aff. ¶¶ 5, 8, at 2-3. Lagestam was deeply concerned, because the scratches looked intentional.  See Lagestam Aff. ¶ 5, at 2.  Lagestam spoke with employees at Grace's daycare facility to see if there had been an accident that might account for the scratches, but the daycare employees told her that Grace had not been

---

[1] Defendants Vehstedt, Saenz, Zarate and Villareal assert that Lagestam's opinions and conclusions are inadmissible, as there is no demonstration that she has the training, education or experience to determine the cause of scratches on a spinabifida child.  See Gross v. Burrggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)(holding that the court may consider on a motion for summary judgment only admissible evidence demonstrating declarant's competence to testify); Fed. R. Civ. P. 56(e).  Johnson argues that Lagestam, as a registered nurse, has the professional training and expertise to testify as to what she observed and to opine as to whether the scratches were intentionally inflicted.  The Court believes such opinions are admissible for purposes of this motion either under Federal Rule of Evidence 702 or under Federal Rule of Evidence 701 which allows lay witnesses to give opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of rule 702."  Fed. R. Evid. 701.

injured at the daycare facility.  See Lagestam Aff. ¶ 6, at 2.[2]

Lagestam reported the injuries to her supervisor, Janie Mealand.  See Lagestam Aff. ¶¶ 7, 8, at 2-3.  Mealand attempted to report the injuries to Grace's case worker, Defendant Anne Holmes, in Las Cruces.  See Affidavit of Janie Mealand ¶¶ 4, 6, at 2 (executed May 19, 2003).  When she was unable to contact Holmes, Mealand called Defendant Sonia Perez at the Roswell office to report the suspected abuse.  See Mealand Aff. ¶¶ 6, 7, at 2.

On or about March 22, 2000, Mealand spoke with Perez, who said she would call Mealand back after speaking with her supervisor.  See Mealand Aff. ¶ 7, at 2.  Perez returned the call on March 24, 2000, giving Mealand information on how to report the suspected abuse, which Mealand followed.  See Mealand Aff. ¶ 8, at 2.  Mealand called Perez three weeks later to check on the progress of the investigation and was told she would be contacted as soon as Perez had any information.  See Mealand Aff. ¶¶ 9, 10, at 3.

Advanced Home Health Care closed out Grace's case in May 2000 at Bogey's request, without having received any further contact from CYFD.  See Mealand Aff. ¶ 11,12, at 3.  CYFD never contacted Lagestram regarding the suspected abuse.  See Lagestram Aff. ¶ 9, at 3; Deposition of Ginger Bowman at 21:23 to 22:23 (taken June 6, 2003).  At the conclusion of the investigation, CYFD offered Bogey respite from caring for Grace, which Bogey declined.  See CYFD Judicial Review Report/Reassessment Adoptive Placement (April 25, 2000).

Holmes ceased to be Grace's caseworker when Grace was placed in the Bogey home, and Perez Sanchez became her case worker.  See Affidavit of Virginia M. Villareal ¶¶ 17-24, at 4-5

---

[2]  The statements of the daycare workers are admissible as evidence that the CYFD allowed the abuse rather than investigated the allegation of abuse.

(executed March 11, 2003).  Holmes was on vacation when Mealand left messages in March 2000.

<u>See</u> Deposition of Anne Holmes at 47:10-14 (taken June 5, 2003).  When Holmes received the

message, she called Mealand and referred her to the correct number to report the abuse.  <u>See</u> Holmes

Depo. at 47:15-18.  The referral was assigned to Ginger Bowman.  <u>See</u> Bowman Depo. at 8:17-18.

Bowman responded within four hours.  <u>See</u> Bowman Depo. at 14:22-25.  She conducted an

investigation in which she spoke to Bogey, examined Grace, and observed the interaction between

Grace and Bogey.  <u>See</u> Bowman Depo. at 13-14.  Bowman conducted a physical examination of

Grace on April 3, 2000, but observed no evidence of scratches or scars.  <u>See</u> Bowman Depo at 12:16

to 14:20.

During Bowman's visit, Grace reacted positively to Bogey and showed no indication of fear;

Bogey had installed  foam pads on furniture in Grace's room to protect her from injury.  <u>See</u> Bowman

Depo. at 13-14.  Bogey was able to explain the bruises and scratches that Lagestam observed.  <u>See</u>

Bowman Depo. at 16:18 - 24, 17:22 to 18:3; Affidavit of Ginger Bowman in Support of Motion for

Summary Judgment ¶¶ 6-7, at 1-2 (executed March 19, 2003); Lagestam Aff. ¶ 3, at 2.  Bowman

concluded that the abuse allegation was unfounded.  <u>See</u> Bowman Depo. at 14:17 - 19, 18:7 - 12.

The state court granted Bogey's petition to adopt Grace on July 31, 2000.  <u>See</u> Amended

Complaint ¶ 22, at 5.  Bogey and Terry Bogey, Veronica's parent,  brought an unresponsive Grace

to the emergency room on September 1, 2000. <u>See</u> Critical Care records.  Three-year old Grace died

September 2, 2000 after resuscitation efforts were unsuccessful.  <u>See</u> Certificate of Death.

Grace's autopsy revealed her arm had been broken two or more weeks before her death, and

she had pneumonia, both of which conditions were untreated.  <u>See</u> Autopsy Report.  State authorities

charged Bogey with homicide given that Grace's death resulted from massive swelling and bleeding

in her brain.  See State of New Mexico v. Veronica Bogey, No. CR 02-196, Grand Jury Indictment

Against Veronica Bogey (Fifth Judicial District Court, County of Chaves, State of New Mexico, filed

June 18, 2002).  Terry Bogey pled guilty to felony child abuse not resulting in death or great bodily

harm, acknowledging participation in delaying the transport of Grace to medical services but denying

he was the source of the injuries resulting in Grace's death.  See State of New Mexico v. Teri Bogey,

No. CR 02-197, Plea and Disposition Agreement (Fifth Judicial District Court, County of Chaves,

State of New Mexico, filed Aug. 12, 2003).  Bogey has not entered a plea with regard to her state

criminal charges, which remain pending.

Scott Johnson is Grace's personal representative.

## PROCEDURAL BACKGROUND

While there are two Plaintiffs, only Johnson has brought Counts III, IV, and VIII.  The Court

has dismissed Count IV against Veronica and Terry Bogey.  See Memorandum Opinion and Order,

filed March 19, 2004 (Doc. 183).  The Court will, therefore, dismiss as moot this motion to the extent

it addresses Count IV.  Count III is Johnson's § 1983 claim against Bogey and Terry Bogey  for

violation of Grace's fundamental due process rights to life, liberty, and freedom from abuse under the

Fourteenth Amendment to the United States Constitution.  Count VIII is Johnson's claim against

Bogey and Terry Bogey for wrongfully causing Grace's death.

Johnson moves for summary judgment only against Bogey. Johnson contends the evidence

against Bogey is undisputed and requires the entry of summary judgement against Bogey on liability

for Counts III and VIII.  Bogey responds that the Court should enter summary judgment against

Johnson on Counts III and VIII, contending that, although the summary judgment issues that Johnson

raises contain disputed issues of material fact and are subject to further discovery, other issues not

raised by Johnson are undisputed and ripe for summary judgment.[3]  Because both parties argue that

the Court should grant summary judgment in their favor on these counts, the parties appear to agree

that there is no genuine issue of material fact, although there may be factual disputes, which would

preclude the entry of summary judgment on these claims.

### STANDARD FOR DECIDING A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories

and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c).  The factual record and all reasonable inferences are construed in the light most favorable to

the nonmoving party.  See O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1096 (10th Cir.

1999); Curtis v. Oklahoma City Pub. Schs. Bd of Educ., 147 F.3d 1200, 1214 (10th Cir. 1998).  The

requirement of a "genuine" issue of fact means that the evidence is such that it "might affect the

outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).

The inquiry then is "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id.,

477 U.S. at 251- 52.  Summary judgment is a drastic remedy, and the court must exercise this remedy

with extreme care to prevent taking genuine issues of fact away from juries.  See Smoot v. Chicago,

---

[3] Bogey asks the Court to enter summary judgment *sua sponte* in Bogey's favor.  A district court may enter summary judgment, *sua sponte*, if it concludes that the non-movant is entitled to summary judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); Ramsey v. Coughlin, 94 F.3d 71, 73 (2nd Cir. 1996).  Indeed, *sua sponte* grants of summary judgment are "an acceptable method of expediting litigation."  Leatherware Co. v. Ann Taylor Inc., 933 F.2d 162, 167 (2d Cir. 1991).  Bogey also asks for the opportunity to conduct further discovery should the court not enter summary judgment in her favor.

R.I. & P.R. Co., 378 F.2d 879, 883 (10th Cir. 1967)(citation omitted).  Summary judgment's purpose

is "not to cut litigants off from their right of trial by jury if they really have issues to try."  See Poller

v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 467 (1962).

## LEGAL ANALYSIS

I.  **THE COURT WILL DENY BOGEY'S MOTION FOR ADDITIONAL DISCOVERY UNDER RULE 56(f).**

A party opposing summary judgment may move for additional time to conduct discovery in

order to rebut the moving party's factual assertions:

> Should it appear from the affidavits of a party opposing the motion that the party
> cannot for reasons stated present by affidavit facts essential to justify the party's
> opposition, the court may refuse the application for judgment or may order a
> continuance to permit affidavits to be obtained or depositions to be taken or discovery
> to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).  Even though Bogey seeks a summary judgment, too, she nonetheless argues

that she has been unable to engage in general discovery because discovery was limited to issues of

qualified immunity, and thus she is unable to dispute most of the facts which Johnson asserts.  See

Order Following Discovery Hearing, filed March 21, 2003 (Doc. 60)(Molzen, M.J.). The limited

discovery allowed Johnson to submit written discovery requests to Bogey, but Bogey was not

afforded the opportunity to conduct discovery under the parties' stipulations regarding discovery

pertaining to the issues of qualified immunity.  See Stipulations on Discovery Regarding Qualified

Immunity, filed April 21, 2003 (Doc. 73).

Limited discovery on the issue of qualified immunity was conducted during June 2003.  The

parties had not filed an Initial Pre-Trial Report ("IPTR") setting appropriate discovery deadlines

beyond the stipulations for the qualified immunity issue at the time Johnson filed this motion on July

17, 2003. The parties have since filed an IPTR. See Initial Pre-Trial Report, filed November 13, 2003 (Doc. 137).

Bogey contends that discovery has, in effect, been stayed pending the resolution of the qualified immunity motions by other parties. Therefore, Bogey has been unable to obtain facts necessary to rebut this summary judgment motion. Bogey argues that, after discovery, she will be able to establish disputed issues of fact sufficient to overcome this motion for summary judgment. She contends discovery will allow her to dispute Johnson's contentions regarding: the financial stipend she received from CYFD; the ability of Kerstin Lagestam and Janie Mealand to make reliable assertions regarding Grace's physical condition; whether Bogey provided appropriate care for Grace; and the autopsy report. In support of her contention that discovery would enable her to dispute plaintiff's facts, Bogey has filed an affidavit from her attorney. See Affidavit by Jerry A. Walz, filed Aug. 13, 2003 (Doc. 86)(executed August 12, 2003). Attached to the affidavit is a motion filed in the New Mexico state court criminal action, which addresses disputes among medical experts as to the cause of Grace's death.

Bogey and the other defendants sought the stay of discovery pending a determination on Defendants' summary judgment motions. See Attorney's Provisional Discovery Plan at 2, filed January 13, 2003 (Doc. 34). Therefore, Bogey has no grounds to complain that she needs discovery before she can dispute the material facts. And even if Bogey did conduct discovery, she would not be able to overcome the summary judgment motion, because she has not denied that she abused and murdered Grace.

Since the hearing on this motion held November 7, 2003, both parties have been free to pursue further discovery and supplement the record for the Court's decision on this motion. See

Transcript of Hearing (Part II) at 142:22 - 143:7 ("I guess what I would encourage the defendants on this to do, the Bogeys -- if you have discovery that you want to submit, get it in here, talk to Mr. Kennedy, and see if there's any problem with submitting or supplementing the record, but you're kind of going to get a little bit of time while I consider these issues, and you might use it to supplement the record, so you may get somewhat what you want under Rule 56(f) just because I may not be able to determine this immediately, so I encourage the plaintiffs, if they're going to submit additional information, to do so.").[4] Neither party has done so. Further, as noted above, both parties ask the Court to enter summary judgment in their favor, indicating that any remaining questions of fact as to the claims before the Court in this motion are not material and should not preclude the entry of summary judgment. The Court will deny Bogey's motion under rule 56(f) for further discovery.

## II.   THE COURT WILL DENY JOHNSON'S MOTION TO STRIKE DEFENDANTS VEHSTEDT, SAENZ, ZARATE AND VILLAREAL'S MEMORANDUM IN RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY AGAINST DEFENDANT VERONICA BOGEY.

Individual Defendants Bonnie Vehstedt, Lydia R. Saenz, Karen Zarate, and Virginia Villareal filed a response to the Plaintiff's Motion for Partial Summary Judgment on Liability Against Defendant Veronica Bogey. See Defendants Vehstedt, Saenz, Zarate and Villareal's Memorandum in Response to Plaintiff's Motion for Partial Summary Judgment Against Defendant Veronica Bogey, filed August 12, 2003 (Doc. 84). Johnson contends that, because he did not direct his motion at these individual Defendants, they do not have standing to respond to the motion, and the Court should, therefore, strike the individual Defendants' response. See Fed. R. Civ. P. 56 ("The adverse party [to a motion for summary judgment] may serve opposing affidavits" in response to a motion for summary

---

[4] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any finalized transcript may contain slightly different page and/or line numbers.

judgment.).  Johnson asserts that these individual Defendants are not specifically adverse to his motion as rule 56 requires.  Further, the federal constitutional claims against Vehstedt, Saenz, and Zarate have been dismissed by stipulation.  <u>See</u> Stipulation of Dismissal at 1-2, filed August 21, 2003 (Doc. 99)(dismissing federal constitutional claims under § 1983 for violation of Grace's due process rights against Defendants Vehstedt, Zarate, Saenz, and Encinias and the § 1983 claims for supervisory liability against Defendants Vehstedt, Zarate and Saenz).

While Johnson does not explicitly recognize these individual Defendants as parties adverse to his motion, the Court will assume, without deciding, that if it were to find Bogey a state actor, that might result in issues of liability for these individual Defendants and/or for CYFD.  These individual Defendants,  therefore, have an interest in responding to this motion.  The Court will, thus, consider the arguments in the individual Defendants' response and will deny Johnson's motion to strike.

## III.    THE COURT WILL GRANT SUMMARY JUDGMENT IN FAVOR OF BOGEY ON COUNT III. [5]

Every person who, under color of state law, subjects any United States citizen to the deprivation of any rights secured by the Constitution shall be liable to the party injured in an action at law.  <u>See</u> 42 U.S.C. § 1983 (2001).  To state a claim under § 1983, a claimant must show: (1) deprivation of a right secured by the federal constitution or federal laws; and (2) that the deprivation was caused by a person acting under color of state law.  <u>See</u> <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988); <u>Adickes v. S.H.Kress & Co.</u>, 398 U.S. 144, 150 (1970).  "To state a cause of action under 42 U.S.C.

---

[5] The Court is not, however, granting summary judgment in Bogey's favor *sua sponte*. Black's Law Dictionary defines *sua sponte* as: "Of his or its own will or motion; voluntarily; without prompting or suggestion." <u>Black's Law Dictionary</u> at 1424 (6th ed. 1990).  Bogey specifically requests that the Court enter summary judgment in her favor on Counts III, IV, and VIII.  The Court is, therefore, granting Bogey's request on Count III.

§ 1983 for an alleged violation of the Fourteenth Amendment and provisions of the Bill or Rights incorporated into the Fourteenth Amendment, 'it is beyond cavil' that challenged conduct must constitute state action." Tool Box v. Ogden City Corp., 316 F.3d 1167, 1175 (10th Cir. 2003) (quoting Johnson v. Rodriguez (Orozco), 293 F.3d 1196, 1201 (10th Cir. 2002)), vacated on reh'g en banc by 355 F.3d 1236 (10th Cir. 2004).

The difficulty here is that Bogey is a private citizen, not a state officer or employee.  If the Court determines that her conduct does not constitute state action -- i.e., that the private party charged with the deprivation cannot be described in all fairness as a state actor -- it need not determine the remaining issues.  The Court will, therefore, begin with the inquiry whether the challenged conduct here constitutes state action.

To determine whether the plaintiff has satisfied the requirement that the deprivation was caused by a person acting under color of law, the court must evaluate a private person's conduct under a two-part framework: (i) "whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority"; and (ii) "whether the private party charged with the deprivation could be described in all fairness as a state actor." Tool Box v. Ogden City Corp., 316 F.3d at 1175 (internal quotation marks and citation omitted).  Although the two principles comprising the inquiry whether the charged individual acted under color of law are related, they are not the same. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).  These two principles "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decision." Id., 457 U.S. at 937 (citing Monroe v. Pape, 365 U.S. 167, 172 (1961)).  In contrast, the two principles "diverge when the constitutional claim is directed against a party without such apparent authority,

i.e., against a private party." Id. 457 U.S. at 937.  The parties agree that Bogey is a private person.

The Supreme Court of the United States has applied various tests to determine if private conduct meets the elements outlined above such that the conduct may be chargeable to the state.  See Scott v. Hern, 216 F. 3d 897, 906 n.2 (10th Cir. 2000).  The United States Court of Appeals for the Tenth Circuit recently reviewed these tests in Tool Box v. Ogden City Corp., 316 F.3d at 1175 -77, acknowledging that determining whether a private party is a state actor in a given situation is an "inherently murky calculation."  Id. 316 F.3d at 1175.  The Tenth Circuit listed and briefly defined the four tests that the Supreme Court has previously used:  (i) the public function test; (ii) the nexus test; (iii) the joint action test; and (iv) the symbiotic relationship test.  See id.  The Tenth Circuit then discussed and applied the Supreme Court's most recent articulation of the test for a state actor, the "entwinement" concept explored in Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 302 (2001).  As the Tenth Circuit explained, the Supreme Court recently "supplemented and clarified these variously competing tests by invoking the concept of 'entwinement.'"  Tool Box v. Ogden City Corp., 316 F.3d at 1176 (citing Brentwood Academy v. Tenn. Secondary Sch. Athletic Assn., 531 U.S. 288, 302 (2001)).  The Court will, thus, first apply the most recent, and generally encompassing, entwinement test.

A.     THE ENTWINEMENT TEST

The concept of entwinement calls for a feasible approach under which "no one fact can function as a necessary condition across the board for finding state action . . . ."  Brentwood Academy v. Tenn. Secondary Sch. Athletic Assn., 531 U.S. at 295.  Further, "the notion of entwinement recognizes that the four foregoing tests are, for all intents and purposes, tools for factual

analysis that 'bear on the fairness of ... an attribution [of state action.]'"   Tool Box v. Ogden City

Corp., 316 F.3d at 1176 (quoting Johnson v. Rodriguez (Orozco), 293 F.3d at 1204 (in turn quoting

Brentwood Academy v. Tenn. Secondary Sch. Athletic Assn., 531 U.S. at 296))).

It is important, in determining whether Bogey was a state actor, to acknowledge the time

frame at issue.  Grace's death occurred just over one month after the state court finalized her

adoption.  After this point, the legal relationship between Bogey and Grace was equivalent to that of

a natural mother and child.

The Court has previously held, however, that Johnson's § 1983 claims are pled so that all

claims relate to her death.  See Memorandum Opinion and Order at 14, filed March 19, 2004 (Doc.

183)("As Johnson has pled them, the § 1983 claims all relate to Grace's death.").  Johnson's theory

is that Grace suffered from "battered child's syndrome" and that Bogey abused Grace both before

and after the final adoption, with the continuing, ongoing battery ultimately resulting in Grace's death.

See Transcript of Hearing (Part I) at 83:15-23 ("[W]hat we'll find is that this is symptomatic of child

abuse or battered child syndrome, which extends over a period of time.  So Your Honor's focusing

on the date of death, but what we're saying is that the torture and the murder began at least in March

and continued through September until the ultimate event, which was the death.  So the death was

only the last incident, and everything ceases, obviously, because the child was dead.  But the

evidence, I think, will be clear that all of this occurred over the elongated period of time.").

The Supreme Court in DeShaney v. Winnebago Cty. Dept. of Soc. Servs., 489 U.S. 189

(1989), held that the state did not commit a constitutional violation when it failed to take affirmative

action to prevent a father from killing his biological child.  See id. at 201 (holding that the state has

no affirmative duty to protect a child from his natural father).  Based on DeShaney v. Winnebago Cty.

-14-

Dept. of Soc. Servs., it appears that Johnson is foreclosed from arguing that Bogey was a state actor

after the state court finalized the adoption. Johnson's argument, however, is that, before the adoption

was finalized, Bogey was a state actor and her abuse of Grace, while she was a state actor, eventually

culminated in Grace's death. Thus, Johnson asks the Court to look at Bogey during the pre-adoptive

placement time frame and find that Bogey was a state actor at that time.

Johnson does not appear to be arguing that Bogey should be considered a state actor after

the adoption, because, based on his "battered child syndrome" argument, if Bogey was a state actor

when the abuse began, then that is sufficient to find a constitutional violation based on Grace's death,

which resulted from Bogey's actions as a state actor. The Court will, therefore, undertake the factual

inquiry whether Bogey was a state actor during the time frame before the state court finalized the

adoption. That factual inquiry involves three separate analyses: (i) whether case law establishes that

a foster parent is a state actor; (ii) whether there is a distinction between a foster parent and a pre-

adoptive parent; and (iii) whether the record establishes that Bogey, as a pre-adoptive parent, could

fairly be considered a state actor.

### 1.    The Court Assumes Without Deciding That A Foster Parent is a State Actor.

Under the New Mexico Children's Code, "'foster parent' means a person, including a relative

of the child, licensed or certified by the department . . . to provide care for children in the custody of

the department . . . ." NMSA 1978, § 32A-1-4(G). By placing a child with a state-approved foster

family, "the state assumes an important continuing, if not immediate, responsibility for the child's

well-being. In addition, the child's placement renders him or her dependent upon the state, through

the foster family, to meet the child's basic needs." D.R. by L.R. v. Middle Bucks Area Vocational

Tech. Sch., 972 F.2d 1364, 1372 (3rd Cir. 1998)(citation omitted).  Consequently, the State is

dependent upon a foster family to provide for a child's basic needs, while a foster parent receives

financial and other incentives to foster a child.

New Mexico extends immunity or indemnity to foster parents for certain acts, in recognition

of the indispensable role foster parents serve to enable the State to meet its legal obligations to

children in its custody.  Specifically, the New Mexico Tort Claims Act ("NMTCA") defines a "public

employee" to include "licensed foster parents providing care for children in the custody of the human

services department."  § 41-4-3(F)(4) NMSA 1978.  Public employment is generally sufficient to

render a defendant a "state actor."  Lugar v. Edmundson Oil Co., 457 U.S. at 395 n. 18 ("[S]tate

employment is generally sufficient to render the defendant a state actor[.]").  As a "public employee,"

a foster parent's unconstitutional acts are indemnified by the state under the NMTCA, which

provides:

> A governmental entity shall pay a settlement or any final judgment entered against a
> public employee for:
>
> a violation of . . . any rights, privileges, or immunities secured by the constitution and
> laws of the United States . . . that occurred while the public employee was acting
> within the scope of his duty.

§ 41-4-4(D)(2) NMSA 1978.  Therefore, the conduct of a foster parent acting within the scope of

her duty is that of "a person for whom the state is responsible."  Pino v. Higgs, 75 F.3d 1461, 1465

(10th Cir. 1996).

Thus, a good case could be made that, under New Mexico law, the state has obligated itself

to pay any damages that a foster parent's physical abuse of a foster child caused that results in a

constitutional violation, by virtue of the foster parent's public employment.  Accordingly, the Court

will assume, without deciding, that a foster parent in New Mexico may fairly be considered a state actor for purposes of alleging a constitutional violation.

> ## 2.   The Court Finds That There is a Distinction Between a Foster Parent and a Pre-Adoptive Parent.

Johnson's primary argument is that Bogey was no different than a foster parent.  There are, however, good reasons to distinguish between a foster parent and a pre-adoptive parent.

The New Mexico Legislature has had two opportunities to indicate that New Mexico law equates foster parents and adoptive parents.  First, as noted above, under the NMTCA, the Legislature provided specific definitions of who may be considered "public employees" within the NMTCA.  See NMSA 1978, § 41-4-3F.  The Legislature chose to include "licensed foster parents" (and thirteen other specific categories) within the statutory definition of a "public employee."  The Legislature did not elect to specifically include adoptive parents.

Second, the Legislature promulgated the Adoption Act, a statute designed to provide the requirements for pursuing adoptions.  See NMSA 1978, §§ 32A-5-1 to 32A-5-45.  The Legislature did not in the Adoption Act indicate that it considered adoptive parents similar to or the same as foster parents, for any purpose.  This statutory distinction is understandable.  The purpose, and end result, of adoption is "to effect a legal relationship between a parent and adopted child that is identical to that of a parent and biological child."  NMSA 1978, § 32A-5-2.  Foster parents, on the other hand, provide temporary, physical custody of children who remain in the state's custody throughout the time they are in foster care.

The New Mexico Administrative Code ("NMAC") lends further support for finding a distinction between a pre-adoptive parent and a foster parent.  First, the NMAC on its face

-17-

distinguishes the two by providing separate regulations under separate sections for foster care and adoptions. See NMAC § 8.26 (Adoption Act Regulations); id. § 8.27 (Foster Parenting). In addition, the regulations establish different requirements for becoming a foster parent as opposed to an adoptive parent. Compare NMAC § 8.26.2.11 ("Any adult is eligible to adopt through the Department once she/he has an approved pre-placement study.") with § 8.27.2.9 ("Any adult who is a legal resident of the country and who resides in New Mexico can apply to be a foster parent."). The distinction here is that, before becoming eligible to be an adoptive parent, one must be subject to a pre-placement study. Thus, someone who has been approved as a foster parent must still go through this additional step before becoming an adoptive parent, which suggests that an adoptive parent -- even before the actual adoption occurs -- stands in different shoes than a foster parent.

Further, adoptions may be sought through independent sources while there is no such mechanism with regard to foster care. Specifically, the Adoption Act allows the State to license private entities and individuals to conduct pre-placement studies so that interested parties may make all arrangements attendant to an adoption before any material government involvement occurs. See NMSA 1978, § 32A-5-13. Independent adoptions are then approved through a hearing and Court order process. See id.

Conceptually, it makes sense that the Court find a distinction between foster parents and pre-adoptive parents. Foster parents actually seek to become an arm of the state -- they do not seek long term or permanent custody of the children they care for and they do not plan to exercise the rights attendant to legal custody of the children. Pre-adoptive parents, on the other hand, do not seek to perform the duties of the state, the end goal is to become a private, familial entity apart from state control. In an unrelated context, the Tenth Circuit has acknowledged this distinction:

-18-

> [T]he status of preadoption may be viewed as conferring a more significant
> relationship than foster care because of the possibility of developing a permanent
> adoptive relationship . . . .  The preadoption agreement in this case differs significantly
> from a typical foster care placement agreement because a preadoption placement
> represents an attempt to find a permanent, stable home for children.  Foster care
> agreements, in contrast, typically involve temporary care during a transitional period
> of a child's life, and for this reason some courts have refused to accord constitutional
> protection to foster family relationships.

Spielman v. Hildebrand, 873 F.2d 1377, 1384 (10th Cir. 1989)(considering whether preadoptive

parents had a liberty interest in the relationship with the adoptee child).

The Court, therefore, finds that there is a meaningful distinction between a foster parent and

a pre-adoptive parent.

### 3.   The Court Finds That, As A Pre-Adoptive Parent, Bogey Was Not A State Actor.

Because the Court is assuming, without deciding, that a foster parent is a state actor in

circumstances like those before the Court, and that there is a meaningful distinction between a foster

parent and a pre-adoptive parent, the Court must next determine whether, as a pre-adoptive parent,

Bogey could fairly be considered a state actor.  This is where the Supreme Court's guidance in

Brentwood Academy v. Tennessee Secondary School Athletic Ass'n is key.  The Court must conduct

a fact-based inquiry, using the Supreme Court's entwinement test, to determine whether Bogey may

fairly be described as a state actor in this case.

Johnson contends that state statutes strongly reflect the interdependent relationship between

Bogey and the State of New Mexico.  This argument, however, is premised on Johnson's contention

that it is immaterial whether Bogey was a foster parent or a pre-adoptive parent.  As the Court has

already determined, the distinction is significant.  While the Court agrees that, to use Johnson's

example, the NMTCA does suggest an interdependence between the state and its public employees,

that interdependence does not transfer into the adoption -- or pre-adoption -- context.  As explained above, there is a distinction between the interaction of the state and a foster parent as compared with the state's interaction with pre-adoptive parents.  A foster parent merely acts as a contract babysitter for a child that is -- and will remain -- in the state's legal custody.  The foster parent is, thus, dependent on the state to make decisions regarding the child's long term welfare and custody arrangements.  A pre-adoptive parent, on the other hand, intends to take legal custody of the child in the long term, and to make decisions regarding the child's long term welfare.  Thus, the pre-adoptive parent's purpose is actually to move away from involvement and interdependence with the state.

Johnson further contends Bogey is a state actor because the state trained, licensed, and provided financial assistance to Bogey while she cared for Grace before the actual adoption.  As a result, the state authorized Bogey to care for a child in the State's legal custody.  Johnson contends that it was this authority to physically care for Bogey that allowed her to commit constitutional violations.

Whether the state provided training, financial assistance or other support to Bogey in aiding her to adopt Grace does not require the Court to find that Bogey was a state actor and liable for constitutional violations.  There are many circumstances in which the state provides financial assistance to parents, such as state subsidized health care programs.  In fact, the state's financial assistance would have continued until Grace's eighteenth birthday.  See In the Matter of the Adoption Petition of Graciela Monique Cano, Post Placement Court Report at 2 ("The New Mexico Children Youth and Families Department is providing the petitioner with a monthly subsidy in the amount of $487.00, which is negotiated on a yearly basis until the child reaches the age of eighteen.").  Yet, the

adoption created a legal relationship between Bogey and Grace equivalent to natural mother and child.  See NMSA 1978, § 32A-5-37 ("After adoption, the adoptee and the petitioner shall sustain the legal relation of parent and child as if the adoptee were the biological child of the petitioner and the petitioner were the biological parent of the child.").  The Court does not believe the mere provision of state financial or other assistance creates the level of "entwinement" the Supreme Court requires to find state action.

Johnson also contends that Bogey was a state actor, because when CYFD learned of Grace's abuse before the finalization of the adoption, CYFD failed to take appropriate action to stop the abuse and continued to support and encourage Bogey to keep custody of Grace.  See Howard v. Malac, 270 F. Supp. 2d 132, 146 (D. Mass. 2003)(finding sufficient facts to show connection between state and foster parent's alleged abuse of child so that foster parent could be fairly considered a state actor).  Specifically, CYFD placed Grace in the Bogey home, trained Bogey to care for Grace, and funded the care of Grace.  Then, when CYFD received allegations that Bogey was physically abusing Grace -- before the state court finalized adoption -- Johnson asserts that CYFD chose not to conduct a proper investigation.  Therefore, CYFD provided Bogey with significant encouragement of the abuse by actively enabling it to continue even after it was reported.

The record establishes that CYFD did investigate the allegations of abuse and Bowman unsubstantiated the one report of abuse.  There is nothing in the string of events establishing that Bogey received encouragement from the state sufficient to make her actions those of the state: "A state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice in law must be deemed to be that of the state."  Tool Box v. Ogden City Corp., 316 F.3d at 1176 (internal

quotation marks and citations omitted).  Johnson has not pointed to support in the record that the state here exercised such "coercive power" or that it provided "significant encouragement" resulting in Bogey's abuse of Grace and Grace's eventual death.

The Supreme Court's direction in <u>Brentwood Academy v. Tennessee Secondary School Athletic Ass'n.</u> and the Tenth Circuit's subsequent guidance in <u>Tool Box v. Ogden City Corp.</u> demonstrate that the entwinement concept requires a court to consider all of the facts before it, no one fact being more important than another, and determine whether those facts suggest an entwinement between the state and the private actor such that the private actor should be considered a state actor for purposes of bringing a constitutional violation claim.  Having reviewed the facts in this case, the Court has determined that Bogey's status as a pre-adoptive parent takes her outside the "public employee" status of a foster parent.  The facts of this case, as discussed, further establish that the State of New Mexico's relationship with a pre-adoptive parent does not give rise to a finding that Bogey may be fairly considered a state actor for purposes of Johnson's § 1983 claims against her.

**B.   THE OTHER TESTS.**

The Tenth Circuit, in <u>Tool Box v. Ogden City Corp.</u>, applied only the entwinement test, suggesting that it considers that test to encompass the analysis of the other, previous tests for state action.  Out of an abundance of caution, however, this Court will briefly review the other four tests that the Tenth Circuit mentioned.

**1.   The Public Function Test.**

"Under the public function test, a court determines whether a private entity has exercised 'powers traditionally exclusively reserved to the State.'"  <u>Tool Box v. Ogden City Corp.</u>, 316 F.3d at 1176 (quoting <u>Jackson v. Metro Edison Co.</u>, 419 U.S. 345, 349 (1974)).  "Such powers have

traditionally included the holding of elections, the performance of necessary municipal functions or the running of a nursing facility."   Tool Box v. Ogden City Corp., 316 F.3d at 1176.

As previously explained, while a foster parent might be said to perform a public function in caring for a child in the state's legal custody, a pre-adoptive parent fulfills a different role.  Pre-adoptive parents intend and seek to perform parental duties, not for children that are and will remain in the state's custody, but for children that they intend to remove from the state's custody.  This moves pre-adoptive parents into the realm of private functions, rather than public functions.  Thus, as a pre-adoptive parent, Bogey did not perform any powers traditionally reserved to the state; in fact, she performed duties typically reserved to the private sphere.  Applying the public function test, Bogey could not fairly be described as a state actor.

## 2.   The Nexus Test.

"Under the nexus test, a court considers whether there is a sufficiently close nexus between the government and the challenged conduct such that the conduct may be fairly treated as that of the State itself."   Id. (internal quotation marks and citations omitted).  The Tenth Circuit explained that "a state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."   Id. (internal quotation marks and citation omitted).  This test focuses on the state's involvement in the challenged conduct at issue.   See Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1448 (10th Cir. 1995)("The [nexus] test insures that the state will be held liable for constitutional violations only if it is responsible for the specific conduct of which the plaintiff complains.")(emphasis added).

There is support for the proposition that a foster parent can fairly by considered an instrument

-23-

of the state for incidents of child abuse where the state knows or suspects that the foster parent is a child abuser.  See Howard v. Malac, 270 F. Supp. 2d at 145 (finding where there is collusion between foster parent known to be abusing a child and a state actor to cover up the abuse, there is a sufficient allegation to survive a 12(b)(6) motion to dismiss on color of law).  See also West v. Atkins, 487 U.S. at 49-50 (holding that a defendant in a § 1983 suit acts under color of state law when he abuses the position the state gave him);  K. H. v. Morgan, 914 F. 2d 846, 852 (7th Cir. 1990); Giron v. Corrections Corp. of America, 14 F. Supp. 2d 1245, 1248-49 (D.N.M. 1999)(observing a defendant acts under color of state law when he abuses a position of authority given to him by the state), rev'd in part on other grounds, 191 F.3d 1281 (10th Cir. 1999).  While there is some support, as noted above, for finding that an abusive foster parent's actions may be attributed to the state, the underlying question is whether Bogey, as a pre-adoptive parent, stands in the same shoes as a foster parent when it comes to determining whether she is a state actor.  As the Court has already found, there are important distinctions between a foster parent and a pre- adoptive parent -- distinctions that counsel against extending any case law regarding foster parents to apply to adoptive parents.

The challenged conduct in this case is Bogey's abuse of Grace.  As noted above, the nexus test focuses on the state's involvement in the challenged conduct.  Johnson's strongest argument that the state involved itself in Bogey's abuse of Grace appears to be that the state did not sufficiently investigate the one allegation of possible abuse that arose while Bogey cared for Grace before the adoption.  As noted above, however, the record establishes that the state did investigate these allegations and the state determined them to be unfounded.  Johnson offers no further evidence that the state affirmatively involved itself in Bogey's abuse of Grace.  The state and its employees were perhaps negligent or failed to exercise professional judgment, but they did not coerce or encourage

Bogey to do what she allegedly did.  The Court does not see a sufficient nexus of involvement by the state in Bogey's conduct under this test.

### 3.      The Joint Action Test.

"Under the joint action test, state action exists if a private party is a 'willful participant in joint action with the State or its agents.'"  Tool Box v. Ogden City Corp., 316 F.3d at 1176 (quoting Dennis v. Sparks, 449 U.S. 24, 27 (1980)).  The Tenth Circuit further explained: "If state and private officials have engaged in a substantial degree of cooperative action, or if the state participation is overt and significant in facilitating the deprivation of constitutional rights, a court will find state action."  Id.  "[T]he focus of [the joint action] test is not on long-term interdependence between the state and a private entity.  Instead, courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."  Gallagher v. "Neil Young Freedom Concert", 49 F.3d at 1453.

"In applying this test, some courts have adopted the requirements for establishing a conspiracy under Section 1983.  These courts conclude that '[a] requirement of the joint action charge ... is that both public and private actors share a common, unconstitutional goal.'"  Id. at 1454 (quoting Cunningham v. Southlake Ctr. for Mental Health, Inc., 924 F.2d 106, 107 (9th Cir. 1991)).  "Other courts applying the joint action test have focused on the manner in which the alleged constitutional deprivation is effected.  These decisions hold that, if there is a substantial degree of cooperative action between state and private officials, or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present."  Id. (internal quotation marks and citations omitted).

As the Court has previously determined, Johnson has not pointed to any fact in the record

-25-

suggesting overt and significant participation of the state in depriving Grace of her constitutional rights.  At most, the actions Johnson points to amount to a negligent handling of the investigation into allegations of potential abuse or to a failure to exercise professional judgment.  Neither has Johnson pointed to support in the record for finding that the state officials in this case had an unconstitutional motive and that they actively conspired with Bogey to accomplish this unconstitutional deprivation. The record is not sufficient, under the Tenth Circuit's guidance, to establish that the state and Bogey acted jointly in any overt and significant manner or in any conspiracy to deprive Grace of her constitutional rights.

### 4.    The Symbiotic Relationship Test.

"[U]nder the symbiotic relationship test, state action will be present if the state 'has so far insinuated itself into a position of interdependence' with a private party that 'it must by recognized as a joint participant in the challenged activity.'" Tool Box v. Ogden City Corp., 316 F.3d at 1176 (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961)(holding that a privately owned restaurant's refusal to serve an African American customer constituted state action because the restaurant leased space from a parking garage owned by a state agency; the Court reasoned that the state's leasing of space to the restaurant conferred a variety of mutual benefits on each party)). See also Milo v. Cushing Municipal Hospital, 861 F.2d 1194, 1196 (10th Cir. 1988)(finding that suspension of the staff privileges of two physicians by a private corporation managing a municipally owned hospital constituted state action).

The Court has previously considered the level of interdependence between Bogey and the state in this case.  Johnson has not pointed to evidence in the record showing that the state has "so far insinuated itself into a position of interdependence" as required by this test to establish that Bogey

-26-

was a state actor.  In fact, all actions by the state with regard to Bogey -- and pre-adoptive parents in general -- are taken for the purpose of decreasing interdependence between the state and the adoptive parents.  The end goal of the adoption process in general is to establish a completely private, familial relationship.  The facts in this case do not suggest any difference from the general process.  Thus, there is an insufficient level of interdependence to establish a symbiotic relationship between Bogey and the state.

The Court, therefore, finds that Johnson has not met his burden under any of the available tests to show that Bogey may fairly be considered a state actor so that her actions are fairly attributable to the state.  The Court will dismiss Johnson's § 1983 claims in Count III against Bogey.

## IV.   THE COURT WILL GRANT SUMMARY JUDGMENT IN FAVOR OF JOHNSON ON COUNT VIII.

New Mexico provides for liability in damages for wrongful death:

> Whenever the death of a person shall be caused by the wrongful act, neglect or default of another, although such death shall have been caused under such circumstances as amount to a felony, and the act, or neglect, or default, is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who . . . would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured.

§ 41-2-1 NMSA 1978.  Johnson contends Bogey caused Grace's fatal injuries by battering her about the head and neck.  Johnson further contends that Bogey's assertion of her Fifth Amendment right against self-incrimination leads to a permissible inference that she murdered Grace.

### A.   THE COURT WILL ALLOW JOHNSON TO PURSUE HIS WRONGFUL DEATH CLAIM AGAINST BOGEY AS A PRIVATE INDIVIDUAL, BUT NOT AS A STATE ACTOR.

Bogey contends that, because Johnson is alleging that Bogey is a state actor, Johnson is suing

-27-

Bogey in her official capacity as a servant of CYFD.  As a result, Bogey can only be held liable for actions in her official capacity as a servant of CYFD if she falls within the waiver of immunity for public employees as defined in the New Mexico Tort Claims Act.  Johnson responds that Bogey "has clearly been sued in her individual capacity, not in an official capacity."  Reply in Support of Plaintiff's Motion for Partial Summary Judgment on Liability Against Defendant Veronica Bogey at 11, filed August 29, 2003 (Doc. 104).  Johnson, however,  still asserts that Bogey was a servant of CYFD, and thus a public employee.  See id.  ("Plaintiff does, however, assert that Veronica Bogey 'was at all relevant times herein a servant of CYFD.'")(quoting Amended Complaint for Civil Rights Violations, Breach of Contract, Tort Claims, and Damages ¶ 6, at 2-3, filed September 4, 2002 in the Second Judicial District, County of Bernalillo, State of New Mexico, attached to the Petition for Removal, filed October 2, 2002 (Doc. 1)("Amended Complaint")); § 41-4-3(F) NMSA 1978 ("'[P]ublic employee' means any officer, employee or servant of a governmental entity").

While in Paragraph 6, at pages 2-3 of the Amended Complaint Johnson states that Bogey was "at all relevant times herein, a servant of CYFD," it appears to the Court that Johnson is arguing in the alternative -- that he has sued Bogey under Count III as an official of the state, or, in the alternative, under Count VIII as a private individual.  The Court has already found that Johnson may not pursue claims against Bogey as a state actor.  Johnson may, however, pursue his wrongful death tort claims against Bogey as a private individual.

## B.  BOGEY HAS NOT CREATED A GENUINE ISSUE OF MATERIAL FACT WHETHER SHE WRONGFULLY CAUSED GRACE'S DEATH.

Bogey has not denied that she physically abused Grace.  Rather, she has pled her Fifth Amendment privilege against self-incrimination in response to every inquiry even remotely related to

such abuse.  Adverse inferences may be drawn against parties in a civil action who invoke the Fifth

Amendment.  See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)("[T]he prevailing rule [is] that the

Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse

to testify in response to probative evidence offered against them[.]"); Mid-America's Process Serv.

v. Ellison, 767 F.2d 684, 686 (10th Cir.1985)(stating parties may assert a Fifth Amendment privilege

in civil case, "in which event they may have to accept certain bad consequences that flow from that

action."); Hughes Tool Co. v. Meier, 489 F.Supp. 354, 374 (D. Utah 1977)(holding Fifth Amendment

does not preclude judgement against party based in part on adverse inference arrived at through his

assertion of Fifth Amendment in civil case).   In this case, Johnson contends that one of those

inferences is that Bogey engaged in a pattern of abuse resulting in Grace's death.

Bogey asserted her Fifth Amendment privilege against self-incrimination in response to

interrogatories and requests for admissions from Johnson.  See Defendant Veronica Bogey's

Responses to Plaintiff's First Set of Interrogatories; Defendant Veronica Bogey's Responses to

Plaintiff's First Set Requests for Admission.  Bogey responds that she has not been afforded the same

opportunity to conduct discovery under the stipulations entered pursuant to Judge Molzen's order

of March 21, 2003.  See Stipulations on Discovery Regarding Qualified Immunity, filed April 21,

2003 (Doc. 73).  In addition, Bogey is preparing and cooperating with her criminal defense attorney

on the related criminal charges.

As noted above with regard to Bogey's rule 56(f) motion, since the hearing on this motion

Bogey has been free to pursue further discovery as necessary to respond to Johnson's motion.  See

Transcript of Hearing (Part II) at 142:22 - 143:7 ("I guess what I would encourage the defendants

on this to do, the Bogeys -- if you have discovery that you want to submit, get it in here, talk to Mr.

Kennedy, and see if there's any problem with submitting or supplementing the record, but you're kind of going to get a little bit of time while I consider these issues, and you might use it to supplement the record, so you may get somewhat what you want under Rule 56(f) just because I may not be able to determine this immediately, so I encourage the plaintiffs, if they're going to submit additional information, to do so."). Bogey has not provided the Court with anything other than her assertions of her Fifth Amendment right against self-incrimination to establish that she did not wrongfully cause Grace's death.

Bogey and Defendants Vehstedt, Saenz, Zarate and Villareal argue that Johnson cannot rely on Bogey's assertion of her Fifth Amendment privilege as evidence that Bogey caused Grace's death. A party moving for summary judgment must introduce actual evidence and cannot rest solely on a negative inference associated with the assertion of Fifth Amendment rights. See La Salle Bank Lake View v. Seguban, 54 F.3d 387, 390 (7th Cir. 1995)(holding that a moving party must introduce evidence on each of the elements of his case and cannot rely solely on negative inference based on a litigants assertion of their Fifth Amendment right against self incrimination to defeat summary judgment). But Johnson does not rely solely on the negative inference associated with Bogey's assertion of her Fifth Amendment rights.

First, Johnson points to the Autopsy Report finding that Grace died as a result of homicide. The Autopsy Report detailed the specific findings based on the autopsy:

This 3 year old girl, Grace Bogey, died of craniocerebral blunt force injuries.

A chest x-ray on admission displayed pneumonia in both lungs, and a computed tomograph (CT) of the head revealed marked cerebral edema and numerous foci of intracranial hemorrhage.

* * *

-30-

There were numerous contusions (bruises) of the child's dace, neck, right buttock, and extremities. None of these bruises were near any previous surgical site or the subcutaneously located VP shunt. Although the exact time of infliction of these bruises cannot be established with certainty, they all are similar in color, and are consistent with recently inflicted injury. Also noted were a series of curved, linear abrasions on the upper right arm, consistent with fingernail scratches (the child's own fingernails were closely trimmed). Internal findings of note included additional bruises of the scalp (subgaleal hemorrhage), slight acute subdural hemorrhage and extensive subarachnoid hemorrhages surrounding the brain.

These injuries, in conjunction with multiple foci of subarachnoid hemorrhage, are consistent with a rapid acceleration/deceleration motion of the head, as incurred in a violent shaking of a child or impact of the child's head on a surface

A postmortem radiograph of the right upper arm revealed a subacute fracture of the midshaft of the right humerus. The appearance of the fracture, which is surrounded by partially calcified callus, is consistent with a fracture in the early healing states; thus, the fracture may have occurred several weeks or more prior to death. The child survived the injuries long enough to develop pneumonia.

* * *

In conclusion, the severity and distribution of injuries are consistent with non-accidental trauma. The manner of death is homicide.

Autopsy Report at 5-7.

Second, Johnson points to the record establishing that Grace was in Bogey's sole custody at the time she died. Third, Terry Bogey, besides Grace and Bogey, was the only other person at the residence when Grace died. Terry Bogey admitted that he abused Grace, but denies having caused the fatal injuries. See State of New Mexico v. Teri Bogey, No. CR 02-197, Plea and Disposition Agreement (Fifth Judicial District Court, County of Chaves, State of New Mexico, filed Aug. 12, 2003). He also admits and acknowledges his participation in delaying Grace's transportation to the hospital. See id. These facts together with the negative inference associated with Bogey's assertion of her Fifth Amendment rights establish that Bogey killed Grace.

Bogey has pointed to no facts in the record to counter this assertion.  Rule 56 requires her to do more than she has done to prevent entry of summary judgment against her.  Thus, Bogey has not created a genuine issue of material fact whether she wrongfully caused Grace's death.  The Court will, therefore, grant summary judgment in favor of Johnson on the liability portion of his wrongful death claims in Count VIII against Bogey.

**IT IS ORDERED** that the Plaintiff's Motion for Partial Summary Judgment on Liability Against Defendant Veronica Bogey is denied in part and granted in part.  The Court will enter summary judgment in favor of Defendant Veronica Bogey and dismiss Count III.  The Court will enter summary judgment on liability in favor of Plaintiff Scott Johnson on Count VIII.  The Court will dismiss this motion as moot with regard to Count IV.  The Court will deny Defendant Veronica Bogey's motion under rule 56(f) of the Federal Rules of Civil Procedure.  The Court will deny Plaintiff Scott Johnson's motion to strike Defendants Vehstedt, Saenz, Zarate and Villareal's Memorandum in Response to Plaintiff's Motion for Partial Summary Judgment Against Defendant Veronica Bogey.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Paul Kennedy
Mary Y.C. Han
Adam S. Baker
Kennedy & Han, P.C.
Albuquerque, New Mexico

*Attorneys for the Plaintiffs*

Tim Flynn-O'Brien
Bryan & Flynn-O'Brien
Albuquerque, New Mexico

>*Attorney for Defendants Bonnie Vehstedt, Lydia R. Saenz,*
>*Karen Zarate, and Virginia Villareal*

Randolph B. Felker
Felker, Ish, Ritchie, & Geer, P.A.
Santa Fe, New Mexico

>*Attorneys for Defendants Anne Holmes, Sonia (Sanchez) Perez,*
>*Ginger Bowman, Denise H. Narvaez, Vivian Encinias,*

Jerry A. Walz
Walz and Associates
Cedar Crest, New Mexico

>*Attorneys for Defendants Veronica Bogey and Terry Bogey*

Michael Dickman
Law Office of Michael Dickman
Santa Fe, New Mexico

>*Attorneys for Defendant Children, Youth, and Families Department*