IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SCOTT JOHNSON, as personal representative of
the estate of GRACIELA CANO a/k/a GRACE
LEE BOGEY, deceased, and LORENA TORREZ,

        Plaintiffs,

vs.                                            No. CIV-02-1239 JB/KBM

ANNE HOLMES, BONNIE VEHSTEDT,
KAREN ZARATE, LYDIA R. SAENZ, SONIA
PEREZ, VIRGINIA VILLAREAL, VIVIAN ENCINIAS,
GINGER BOWMAN, DENISE H. NARVAEZ,
JANE DOE, and JOHN DOE in their individual
capacities, the NEW MEXICO CHILDREN, YOUTH
AND FAMILIES DEPARTMENT, TERRY BOGEY,
a/k/a TERI BOGEY, and VERONICA BOGEY,

        Defendants.

MEMORANDUM OPINION

     **THIS MATTER** comes before the Court on the Defendant Villareal's Motion for Summary

Judgment and Qualified Immunity Dismissing Count I and Memorandum in Support Thereof, filed

March 16, 2003 (Doc. 55). The primary issue is whether Defendant Virginia Villareal acted in

exercise of her professional judgment such that she is entitled to qualified immunity from this suit.

Because the Court finds that Villareal did act in exercise of her professional judgment, and that she

is, therefore, entitled to qualified immunity, the Court will grant her motion for summary judgment,

and dismiss Count I against her.[1]

---

    [1] The Court has previously entered an Order granting Defendant Villareal's Motion for
Summary Judgment and Qualified Immunity Dismissing Count I. See Order, filed  March 30, 2004
(Doc. 194). This opinion is intended to explain more fully the Court's reasoning for its previous
Order.

**FACTUAL BACKGROUND**[2]

The consent decree in effect at the time of the relevant events required CYFD to secure a signed placement agreement for Grace's adoption within sixty (60) days of the date on which she was freed for adoption.  See Joseph A. v. Wilson, et al., No. CIV-80-623 JC/DJS, Stipulated Exit Plan ¶ III(B)(1) (D.N.M., filed February 25, 1998 (Doc. 1546)); Affidavit of Alvin L. Sallee ¶ 4(a), at 3 (executed August 2003).  Lorena Torrez relinquished her parental rights and consented to Grace's adoption on March 15, 1999.  See In the Matter of Stephanie Torrez, Amanda Hernandez, and Grace Cano, and Concerning Lorena Torrez, Eladio Hernandez, and Jesus Cano, Respondents, Relinquishment of Parental Rights and Consent to Adoption (In the Children's Court, Third Judicial District Court, County of Dona Ana, State of New Mexico, filed March 15, 1999).   Because the CYFD Defendant did not find a match between Grace and an adoptive home within three months of her having been freed for adoption, pursuant to the consent decree, the case should have been assigned to the caseload of an adoption recruitments specialist to conduct an intensive, individualized recruitment for Grace.  See Stipulated Exit Plan Pt. III(C)(2), at 6; Sallee Aff. ¶ 4(b), at 3.  The CYFD Defendants did not take any individual recruitment action.  See Sallee Aff. ¶ 4(b), at 3; Deposition of Vivianne Encinias at 28:21-36:10 (taken June 19, 2003).  Bogey did not sign an Agreement of Adoptive Placement with CYFD until November 6, 1999.  See Agreement of Adoptive

---

[2] Plaintiff's Response in Opposition to Defendant Virginia Villareal's Motion for Summary Judgment and Qualified Immunity Dismissing Count I, filed August 15, 2003 (Doc. 89), incorporates by reference all material facts set forth in Plaintiff's Response in Opposition to Defendant Sonia Perez Sanchez' Motion for Summary Judgment and Qualified Immunity Dismissing Count I, filed August 15, 2003 (Doc. 88).  Having reviewed the materials, the Court notes that they consist of facts not material to this motion because they do not involve Villareal, the Defendant who brings this motion. The Court will, therefore, not include in this opinion those facts which are not material to this motion.

Placement (November 6, 1999).

On November 8, 1999, Defendant Sonia Perez Sanchez was the social worker for Grace.  See Affidavit of Virginia Villareal ¶¶ 17, at 4 (executed March 11, 2003).  Perez Sanchez provided preadoptive services from November 1999 through May 22, 2000. See id. ¶ 24, at 5.  Villareal was the placement Social Worker Supervisor in CYFD's Roswell (Chavez County) office. See id.  ¶¶ 3, 17, 18, at 1, 4.

Defendant Denise Narvaez conducted an adoption home study of Veronica Bogey, and Villareal approved the home study.  See id. ¶ 5, at 2.  Veronica Bogey, a single working parent, did not have the resources or ability to parent Grace given her intensive medical and developmental needs.  See Sallee Aff. ¶ 4(d), at 4.  Defendant Anne Holmes expressed this concern to her supervisor, Defendant Denise Narvaez, on or about July 14, 1999.  See Running Narrative, entry for July 14, 1999.

Villareal and others decided to match Grace with Veronica Bogey, who received a full description of Grace's medical and social history and needs.  See Villareal Aff. ¶ 14, at 4.  Although Grace was not physically placed by preadoptive placement in Bogey's home until November 1999, id. ¶17, at 4, Villareal and others had made the decision to place her there at the September 2, 1999 matching staffing, see Deposition of Virginia Villareal at 10:19-11:8 (taken June 6, 2003); Deposition of Sonia Perez (Sanchez) at 16:14 to 18:24 (taken June 6, 2003).  Because the CYFD Defendant did not make professional placement efforts, they identified Veronica Bogey as the only adoptive family for Grace.  See Encinias Depo. at 28:21-36:10.

The Plaintiff's expert contends that the consent decree's provisions represent the minimum standards for professional judgment required to be exercised for the adoptive placement of a child

-3-

in the State's custody.  See Sallee Aff. ¶ 4(c), at 4.  Further, because Grace was a special needs child who had been in the State's custody since approximately January 2, 1998, the CYFD Defendants had an obligation to recruit adoptive families from a regional or national pool of potential adoptive homes, and to make other special efforts to find an appropriate home.  See id.  The CYFD Defendants conducted a matching staffing with only one family, Veronica Bogey, and did not consider another family that had expressed interest in adopting Grace, the Tonks family, because the CYFD Defendants' inaction had already put them well past the deadline to do so.  See Encinias Depo. at 34:6 - 36:10.  Johnson asserts that, as a placement social worker supervisor, Villareal knew or deliberately ignored that the CYFD Defendants' efforts to place Grace in an adoptive home fell below these minimum standards.

As early as February 2000, Veronica Bogey informed Sanchez that she intended to move to Wisconsin to be with her father, Terry Bogey, who would help her care for Grace.  See Running Narrative, entries of February 3, 2000 and March 15, 2000.  Johnson asserts that this knowledge created a professional obligation for all of the Defendants to conduct an investigation of Terry Bogey.  See Sallee Aff. ¶ 4(k), at 7.  This obligation existed even if Terry Bogey was not going to care for Grace until after the adoption was finalized, because the best interests of the child demanded it, and the disruption rate for an adoption, in which the child comes back into the system after an adoption is finalized, is approximately 15%.  See id.; NMAC § 8.26.2.17(B)("The best interests of a child is paramount in matching a child with an adoptive family.").

Villareal signed a consent to Veronica Bogey's adoption of Grace on March 22, 2000.  See Adoption Consent.  Villareal asserts that Perez Sanchez received a referral from Advanced Home Care regarding Grace on March 24, 2000.  While Villareal was not in the office, the records reflect

-4-

that Sanchez advised Advanced Home Care to call the referral in to Statewide Central Intake ("SCI").

<u>See</u> Villareal Aff. ¶ 26, at 6.  SCI forwarded the referral to Defendant Ginger Bowman to investigate.

<u>See id.</u>  On April 24, 2000, Bowman advised that she did not plan to substantiate the investigation.

<u>See id.</u> ¶ 27, at 6.

Johnson contends that the referral occurred on March 22, 2000,[3] when health care worker Janie Mealand informed Sanchez that Veronica Bogey was physically abusing Grace, who had suffered "cuts, bruises, [and] welts" which were "excessive/inappropriate."   Affidavit of Janie Mealand ¶ 7, at 2 (executed May 19, 2003); APS/CPS Intake Report at 1.  Johnson contends that Sanchez informed Mealand that Sanchez would speak with her supervisor, Villareal, and call Mealand back.  <u>See</u> Mealand Aff. ¶ 7, at 2.  Johnson then asserts that Sanchez did not take action on March 22, the date of the referral, even though she knew that Veronica Bogey intended to leave with Grace on vacation on March 25.  <u>See</u> Perez Depo. at 40:13-24 (identifying notes of March 15 telephone call in which Veronica Bogey informed Sanchez that she would be taking Grace to Wisconsin for spring break between March 25 and 31).  Rather, Sanchez called Mealand back on March 24 and told Mealand to call CYFD's 1-800 number to report the suspected abuse.  <u>See</u> Mealand Aff. ¶ 8, at 2.  Mealand did so, and reported that this was an urgent matter that needed immediate attention.  <u>See</u> <u>id.</u>

In any case, Mealand did not at any point speak with Villareal.  Villareal was not in the office

---

[3]   Villareal contends that Mealand's affidavit and the APS/CPS Intake Report do not necessarily support Johnson's assertion that Mealand made the referral on March 22.  Mealand's affidavit states: "I called Sonia Perez on or about March 22, 2000 to report the suspected abuse of Grace and to ask that Grace's adoption not be finalized until the matter was investigated."  Mealand Aff. ¶ 7, at 2.  The APS/CPS Intake Report is dated March 24, 2000.  <u>See</u> APS/CPS Intake Report at 1.  Thus, the only documented date of the referral is March 24, 2000.

at the time of the referral, and Mealand spoke with Sanchez, who consulted with Narvaez, not Villareal, about her conversation with Mealand.  See Running Narrative, entries for March 24, 2000. Villareal did not learn of the referral until after CYFD assigned Bowman to investigate it on March 24.

On or about April 24, 2000, Villareal e-mailed Bowman, stating: "I have a judicial review coming up . . . . Have you had a  chance to complete your investigation?"  Running Narrative, entry for April 24, 2000.  Bowman responded: "I haven't actually completed the investigation . . . but I do not plan to substantiate the allegations.  If there is any new information, I would be happy to discuss it with you." Id.  Villareal did not discuss the matter with Bowman. See Villareal Depo. at 20:10-14. On April 25, 2000, Sanchez prepared a Judicial Review Report/Reassessment indicating that there was no evidence that Veronica Bogey was abusing Grace.  See Judicial Review Report/ Reassessment at 2.

On May 3, 2000, a Judicial Review occurred in Las Cruces, and all parties were notified of the referral and that the determination was unsubstantiated.  See Villareal Aff. ¶ 23, at 5.  After Sanchez left her employment on May 22, 2000, Villareal personally took over Grace's case.  See Running Narrative, entry for May 19, 2000.  Between May 22, 2000 and Grace's adoption on July 31, 2000, Villareal did not visit the Bogey home. See Villareal Depo. at 22:8-23:4.  During that time frame, Grace had no other contact with the outside world, because Veronica Bogey had removed Grace from daycare and fired the home health nurses. See Mealand Aff. ¶ 11, at 3. Villareal prepared a Post Placement Court Report that did not mention the report of abuse or any efforts to investigate it. See, In the Matter the Adoption Petition of Graciela Monique Cano, Child, Post Placement Court Report (filed in the Fifth Judicial District, State of New Mexico, County of Chaves, June 6, 2000).

-6-

Villareal was aware of Veronica Bogey's intent to live with Terry Bogey no later than May 2000.  See Running Narrative, entry for May 2000.  Johnson asserts that, had  Sanchez or Villareal conducted a background investigation of Terry Bogey, they would have discovered: (i) that Veronica Bogey holds Terry Bogey out as both her mother and her father, see Voluntary Statement of Veronica Bogey at 1; (ii) that Terry Bogey holds himself out as Veronica Bogey's mother, see Voluntary Statement of Teri Bogey at 1 (September 2, 2000); and (iii) that Terry Bogey dresses as a woman, and claims to be a hermaphrodite who gave birth to Veronica Bogey, see State of New Mexico v. Teri Bogey, Affidavit for Arrest Warrant at 6.[4]  Johnson's position is that under those circumstances, a professional social worker would reasonably conclude that neither Veronica Bogey nor Terry Bogey were fit to parent Grace safely and appropriately.  See Sallee Aff. ¶ 4(1), at 8.

Terry Bogey moved in with Veronica Bogey, unbeknownst to Villareal, in July 2000, about two weeks before the adoption.  See Voluntary Statement of Terry Bogey at 5 (taken September 15, 2000).  Villareal met Terry Bogey at court on the day that the adoption was finalized, but did not speak to him.  See Villareal Depo. at 20:22-21:5.

The Court approved Veronica Bogey's adoption of Grace on July 31, 2000.  See Villareal Aff. ¶ 28, at 6.  Villareal contends that at all times she believed that Grace was not in danger from Veronica Bogey and believed Grace to be in a safe home.  See id. ¶¶ 30, 31, at 6-7.

## STANDARD FOR SUMMARY JUDGMENT WHEN A DEFENDANT HAS RAISED THE QUALIFIED IMMUNITY DEFENSE

---

[4]  Some of the assertions contained in these statements are admissions by party opponents, and therefore do not constitute hearsay.  See Fed. R. Evid. 801(d)(2),  Alternatively, Johnson is not introducing these exhibits for the truth of the matters asserted therein, but to demonstrate that Veronica Bogey had been untruthful with the CYFD Defendants and that she and Terry Bogey were mentally unbalanced.

Qualified immunity "protects government officials from personal liability unless their actions violate clearly established law of which a reasonable person would have known." Coen v. Runner, 854 F.2d 374, 377 (10th Cir. 1988).  A court required to rule upon the qualified immunity issue must first consider the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [state official's] conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001).  If so, "the next, sequential step is to ask whether the right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case." Id.  Still, "[q]ualified immunity does not protect official conduct simply because the Supreme Court has never held the exact conduct at issue unlawful.  Rather, the shield of qualified immunity is pierced if in light of pre-existing law, the unlawfulness of the conduct is apparent to the officer." Lawmaster v. Ward, 125 F.3d 1341, 1350 (10th Cir. 1997).  See Hope v. Pelzer, 536 U.S. 730, 739-40 (2002); Harris v. Maynard, 843 F.2d 414, 417 n. 4 (10th Cir. 1988).

A defendant is not entitled to qualified immunity if the plaintiff can demonstrate that there are factual disputes relevant to the defendant's assertion of immunity. See Lawmaster v. Ward, 125 F.3d at 1349.  If the plaintiff makes the required two-fold showing, the defendant then bears the usual summary judgment movant's burden of showing that there are no genuine issues of material fact whether his or her actions were "'objectively reasonable in light of the law and the information he or she possessed at the time.'" Hinton v. City of Elwood, 997 F.2d 774, 779 (10th Cir. 1993)(quoting Coen v. Runner, 854 F.2d at 377).

Summary judgment, in turn, "is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

-8-

of law." <u>Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.</u>, 52 F.3d 1522, 1527 (10th Cir. 1995). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." <u>Id.</u> The movant for summary judgment bears the burden of "showing an absence of a genuine issue of material fact." <u>Wilson v. Meeks</u>, 52 F.3d 1547, 1552 (10th Cir. 1995).

On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). The Court must "accept all of [the plaintiff's] evidence as true, drawing all reasonable inferences in his favor, and may not downplay his evidence, or conduct a 'paper trial' on the merits of his claim." <u>Reed v. McBride</u>, 178 F.3d 849, 852 (7th Cir. 1999).

## LEGAL ANALYSIS

I. **JOHNSON DOES NOT NEED ADDITIONAL DISCOVERY UNDER RULE 56(f) BEFORE THE COURT RULES ON THIS MOTION FOR SUMMARY JUDGMENT.**

Villareal brings her motion under rule 56. Subsection (f) of this rule states:

> Should it appear from the affidavits of a party opposing [a motion for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed .R. Civ. P. 56(f). Johnson contends that, although the material factual issues set forth herein are sufficient to defeat Villareal's motion for summary judgment, he cannot present by affidavit or otherwise all of the facts justifying his opposition to Villareal's summary judgment motion at this time. Johnson's counsel submitted a rule 56(f) affidavit. Johnson contends that the Court should deny Villareal's motion or, in the alternative, permit Johnson to take additional discovery before

ruling on her motion.  Specifically, Johnson seeks time to obtain Grace's medical records, to obtain Sanchez and Villareal's caseload information, and to depose Theresa Vasquez.  See Response at 14, 15.

Johnson's expert witness, Alvin Sallee, has reached a preliminary opinion that Veronica Bogey, as a single working parent, was not able to parent Grace, given her intensive medical needs and required levels of supervision.  See Sallee Aff. ¶ 4(d), at 4.  Johnson asserts that he needs additional discovery to obtain Grace's medical records and medical information for the period during which she was placed with Veronica Bogey, in part so that Sallee may determine to a certainty whether the demands placed on Veronica Bogey by Grace's special needs exceeded her ability to safely care for Grace.  See id. ¶ 5(a), at 9.

Johnson also intends to demonstrate that Sanchez was carrying an excessive caseload, and had a professional obligation to reduce her caseload if she contends that it prevented her from exercising her professional judgment with regard to Grace's case.  See id. ¶ 4(e), at 4-5.  Villareal took over Sanchez' caseload in May 2000, after Sanchez left CYFD.  Johnson asserts that he, therefore, needs additional discovery to obtain Sanchez' training and personnel records, and case logs, and to confirm that she lacked adequate training and support, that her caseload was unmanageable to her and then to Villareal, and that Sanchez and Villareal had a professional obligation to reduce the caseloads to exercise their professional judgment with regard to Grace's case.  See id. ¶¶ 4(d) and (m), at 4, 8.

Johnson further intends to demonstrate that Sanchez' acceptance of a double caseload was not because of insufficient funding of the Roswell CYFD office, but was rather because of a pervasive failure in  the recruitment of qualified CYFD employees by Villareal and others.  See id. ¶ 4(f), at 5.

-10-

Johnson asserts that he, therefore, needs additional discovery to obtain documentation of efforts that the CYFD Defendants made to recruit social workers at the Roswell CYFD office, so that Sallee may determine with certainty whether the recruitment efforts at that office reflect the systemic recruitment problems he has observed within CYFD generally.  See id. ¶ 5(f), at 10.

Veronica Bogey removed Grace from daycare in mid-May 2000.  Johnson intends to depose Vasquez or locate her for the purpose of obtaining a sworn affidavit reflecting her unsworn statement to law enforcement officers.  Johnson asserts that this information is probative of Veronica Bogey's attempt to hide her further abuse of Grace after she learned that allegations of abuse had been reported to the CYFD Defendants.

Johnson has not explained why, during the discovery period that the Court allowed, he did not obtain the discovery sought in this motion.  Johnson has always had the authority, as Personal Representative, to obtain medical records and did not do so.  With regard to caseload information, this motion and Villareal's affidavit, both filed on March 14, 2003, were specific in alleging the resource limitations.  See Villareal Aff. ¶¶ 19-22, at 5.  Johnson had an opportunity to depose Sanchez and Villareal about their caseloads and could have requested documents from CYFD on that issue as part of the Stipulation on Discovery Regarding Qualified Immunity, filed April 21, 2003 (Doc. 73).  The Honorable Karen B. Molzen, United States Magistrate Judge, instructed the Plaintiffs that, if there was any discovery necessary to respond to Defendants' motions that Defendants would not stipulate to, the Plaintiffs were to raise the issue to the Court by April 21, 2003.  See Order Following Discovery Hearing, filed March 21, 2003 (Doc. 60)("[N]o later than April 21, 2003 [Plaintiffs] will file with the court . . . motions under Fed. R. Civ. P. 56(f).").  Johnson did not file any motion or otherwise inform the Court of a need for additional discovery.  The Defendants have

produced all documents voluntarily.

Johnson had the right to depose Vasquez under the Stipulation on Discovery Regarding Qualified Immunity.  The stipulation provided for the taking of the Depositions of Mealand, Vasquez, and others.  Johnson chose not to take Vasquez' deposition and cannot now assert that he was unable to obtain this deposition.  The Court will, therefore, deny Johnson's request to stay the ruling on this motion pending further discovery.

**II.      JOHNSON HAS NOT CREATED A GENUINE ISSUE OF MATERIAL FACT WHETHER VILLAREAL VIOLATED GRACE'S CONSTITUTIONAL RIGHTS AND VILLAREAL IS, THEREFORE, ENTITLED TO QUALIFIED IMMUNITY.**

Count I of Johnson's Amended Complaint states a § 1983 claim against Villareal for her violation of Grace's due process rights under the fourteenth amendment.  The fourteenth amendment protects citizens against state actions that deprive them of life, liberty, or property without due process of law.  See U.S. Const. Amend. XIV.  "[T]he right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause."  Youngberg v. Romero, 457 U.S. 307, 315 (1982).

**A.      THE CONSTITUTION GENERALLY DOES NOT IMPOSE AFFIRMATIVE DUTIES ON GOVERNMENT WORKERS TO PROTECT INDIVIDUALS.**

Persons in state custody have due process rights to "reasonable care and safety."  Id. at 324.  The United States Court of Appeals for the Tenth Circuit has held that this due process right to be reasonably safe while in state custody under the fourteenth amendment extends to children in foster care.  See Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d 883, 892 (10th Cir. 1992). See also Omar v. Lindsay, 334 F.3d 1246, 1248 (11th Cir. 2003)(holding that foster children have a clearly established fourteenth amendment liberty interest in physical safety)(citing Taylor v.

-12-

Ledbetter, 818 F.2d 791, 794-95 (11th Cir. 1987)); K.H. v. Morgan, 914 F.2d 846, 852 (7th Cir. 1990).

The due process clause, however, "generally confer[s] no affirmative right to governmental aid, even when such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196 (1989). Under DeShaney v. Winnebago County Dep't of Soc. Servs., the Supreme Court of the United States held that the fact that the state once had custody of a child did not create a constitutional duty to protect the child after the return of the child to his father. See 489 U.S. at 201 ("[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter."). The Tenth Circuit has recognized two exceptions to the DeShaney rule that the state is not constitutionally liable for injuries committed by third parties.

1. **There are Exceptions to the DeShaney Rule.**

a. **Special Relationships Exception.**

The first exception is the "special relationship" doctrine, which applies when children are in state legal custody and are placed without justification based on financial constraints or professional judgment in a foster home or institution known to be dangerous. See Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d 883, 893-94 (10th Cir. 1992). The special relationship doctrine is inapplicable when the child is not in state custody at the time of injury. See Currier v. Doran, 23 F. Supp. 2d 1277, 1280 (D.N.M. 1998)(finding special relationship exception inapplicable because child was not in state custody at the time he was killed), rev'd on other grounds, 242 F.3d 905, 919 (10th Cir. 2001).

CYFD placed Grace with Veronica Bogey in November 1999. On July 31, 2000, the

-13-

Children's Court approved Veronica Bogey's adoption of Grace.  Pursuant to New Mexico law, once the adoption occurred, Grace and Veronica Bogey had the legal relationship of biological parent and child.  See NMSA 1978, § 32A-5-37.  The parties do not dispute that a special relationship existed up until the adoption on July 31, 2000.  See Transcript of Hearing (Part I) at 14:12-18.[5]  The dispute is whether the adoption cuts off the special relationship.

Johnson contends that, if Bowman violated Grace's rights in investigating an abuse referral while Grace was in state legal custody, then all Defendants would continue to have a special relationship after the adoption.  See Response at 20.  The Tenth Circuit, in Currier v. Doran, allowed conduct which occurred while a special relationship existed to be considered in relation to the danger creation claim.  It does not, however, create a never-ending special relationship.  See Currier v. Doran, 24 F.3d at 917-20; Currier v. Doran, 23 F. Supp. 2d at 1280 (holding that special relationship doctrine is inapplicable where the plaintiffs failed to allege child was in state custody at the time father killed him); A.S. by and through Blalock v. Tellus, 22 F. Supp. 2d 1217, 1220-22 (D. Kan. 1998)(holding that legal custody without physical custody by state is insufficient to trigger special relationship doctrine).  The Court need not, however, decide on this motion that a special relationship continued to exist after the adoption on July 31, creating a continuing duty on the part of Villareal, because the Court finds that Villareal upheld this duty by exercising professional judgment toward Grace through this case.

### b.    State Created Danger Exception.

The other exception is the "danger creation" theory.  The Tenth Circuit, relying on dicta in

---

[5] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

DeShaney, has recognized a claim holding state officials liable for the acts of third parties when those officials created the danger that caused the harm.  See Currier v. Doran, 242 F.3d at 917-18.  To make out a proper danger creation claim, the plaintiff must demonstrate that: (i) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff was a member of a limited and specifically definable group; (iii) the defendants' conduct put the plaintiff at substantial risk of serious, immediate and proximate harm; (iv) the risk was obvious or known; (v) the defendants acted recklessly in conscious disregard of that risk; and (vi) such conduct, when viewed in total, is conscious shocking.  See id. at 918.

In the context of a state's social work involving an abused child, these elements may be satisfied by showing that the state placed or left a child in the custody of an abuser based on a recommendation or other action by a state social worker that reflects a reckless and conscious disregard of an obvious or known substantial risk of serious, immediate, and proximate harm.  See Currier v. Doran, 242 F.3d at 919-22.

## B.   VILLAREAL UPHELD ANY DUTY TO GRACE BY EXERCISING PROFESSIONAL JUDGMENT TOWARD GRACE THROUGHOUT THIS CASE.

Recognizing that children in the state's custody are "'entitled to more considerate treatment and conditions' than [are] criminals" under the eighth amendment's deliberate indifference standard, the Tenth Circuit held that the standard of conduct for liability to be applied in the foster care setting is "failure to exercise professional judgment." Yvonne L. v. New Mexico Dep't of Human Servs, 959 F.2d at 894 (quoting Youngberg v. Romero, 457 U.S. 307, 321-22 (1982)). A decision by a professional is presumptively valid. See Youngberg v. Romero, 457 U.S. at 323. Johnson asserts that Villareal did not exercise professional judgment in placing Grace in Veronica Bogey's home, in

-15-

supervising Sanchez, and in supervising Grace in the Bogey home after Villareal received sole responsibility for the handling of Grace's case.  Johnson contends that  these failures proximately caused Grace's death.

First, Johnson asserts that Villareal abdicated her professional judgment in placing Grace with Veronica Bogey in the face of evidence that she would be incapable of providing for Grace's intensive medical and developmental needs.  See Sallee Aff. ¶ 4(d); Running Narrative, July 14, 1999 entry by Holmes ("I expressed concern because [Veronica Bogey is] single & wondered whether she'll be able to meet Grace's needs.").

Second, Johnson contends that Villareal did not meet her professional obligations to supervise Sanchez in her provision of post placement services to Grace.  A supervisor may be liable under § 1983 where the plaintiff shows an affirmative link between the constitutional deprivation and the supervisor's personal participation, exercise of control or direction, failure to supervise, or actual knowledge and acquiescence.  See Worrell v. Henry, 219 F.3d 1197, 1214 (10th Cir. 2000); Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996); Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988).  Johnson asserts that Villareal did not monitor Sanchez' social work, which Johnson contends was unprofessional.  Specifically, Villareal did not ensure that Sanchez conducted the necessary home visits; did not stay abreast of Sanchez' mishandling of Mealand's referral; and did not make arrangements for a transition of Grace's case after Sanchez left CYFD.  Johnson contends that Villareal's knowledge that Sanchez was overloaded heightened her supervisory responsibilities, rather than diminishing them.

Third, Johnson alleges that Villareal did not personally supervise Grace in Veronica Bogey's home after she received sole responsibility for the case.  This failure to supervise permitted Veronica

-16-

Bogey to continue her abuse of Grace with impunity, and permitted Terry Bogey to move into Veronica Bogey's home, where he too engaged in the physical abuse of Grace, culminating in her death only weeks after the adoption was finalized.

Johnson asserts that these allegations preclude granting summary judgment for Villareal on the basis that she is entitled to qualified immunity. Because the Court has assumed, without deciding that a special relationship existed in this case, the question is whether, taking into account Johnson's assertions, Villareal acted in exercise of her professional judgment as required when a special relationship exists.

At all times it was Villareal's professional judgment that Veronica Bogey provided a safe home. See Villareal Aff. ¶¶ 30-31, at 6-7. Veronica Bogey had no criminal record. See CYFD Adoption Home Study at 11 (May 24, 1999). The home study, which Denise Narvaez prepared, showed that CYFD approved Veronica Bogey. See id. at 10. In the matching staffing, it was the consensus, including the opinion of the adoption consultant, Vivian Encinias, that the Veronica Bogey home was appropriate for Grace. See Villareal Aff. ¶ 11, at 3. According to Villareal, there was no evidence at that time that Veronica Bogey was a danger to Grace. See id.

Johnson asserts that, after placement, there were insufficient home visits. See Complaint ¶ 25, at 5. Villareal asserts that, although the full staffing for her placement unit was two social workers and one supervisor, between November 27,1999 and May 14, 2000, there was only one social worker. See Villareal Aff. ¶¶ 19-21, at 5. In May 2000, that social worker -- Sanchez -- resigned, leaving only Villareal as supervisor. See id. Nevertheless, CYFD representatives made three visits to the Bogey home before Grace's adoption on July 31, 2000. As a result of the staffing shortage, telephone contacts sometimes substituted for actual home visits. See Villareal Aff. ¶ 22,

-17-

at 5.  Grace also had home health care visits and day care, so she had daily contact with outside sources.  See id.  It was one of these outside sources that made a referral in March 2000.  See id. ¶ 26, at 6.  Bowman did not substantiate that referral.  See id. ¶ 27, at 6.

A social worker is not liable for deficiencies caused by a limitation in resources.  See Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d at 894.  Johnson asserts that there are material factual disputes whether Villareal ran her office with a staffing shortage because of financial constraints or because of Villareal's failure to engage in the proper recruitment of qualified employees.  Johnson does not point to any facts in the record supporting the assertion that Villareal was not acting under severe financial restraints.  Rather, Johnson points to "anticipated facts" based on his request for additional discovery.  In light of the Court's ruling on Johnson's discovery requests, these "anticipated facts" are insufficient to create a genuine issue of material fact on this point.

A social worker is not liable for negligence.  See id. ("Failure to exercise professional judgment does not mean mere negligence.").  See also County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").  Failure to follow every state regulation is not a violation of the standard of professional judgment.  See Bailey v. Pacheco, No. CIV 96-959, Memorandum Opinion and Order at 9 (D.N.M. filed April 6, 2000)(Hansen, J.)(holding that failure to follow state regulations does not constitute absence of professional judgment).  The affirmative duty is not to comply with every state regulation, but to do that which is necessary in light of the liberty interest, in this case, the right to reasonable safety.  See id. See also Youngberg v. Romero, 457 U.S. at 319 n.25.

In this case, there was one referral based on allegations of possible abuse by Veronica Bogey.

-18-

Bowman investigated the referral and unsubstantiated it.  See Villareal Aff. ¶¶ 26-27, at 6.  CYFD fully informed all parties, including the Court, about the referral and investigation results.  See id. ¶ 28, at 6.  See Bailey v. Pacheco, Memorandum Opinion and Order at 17 (holding that placement worker is entitled to rely on conclusions of investigative social worker).

At all times it was Villareal's professional judgment that Grace was in a safe home.  Villareal is therefore entitled to summary judgment.  As a supervisor, through May 2000, she had no direct involvement in any violation of civil rights.  See DeAnzona v. City & County of Denver, 222 F.3d 1229, 1235 (10th Cir. 2000)(reversing district court's denial of supervisor's motion for qualified immunity, and finding the supervisor did not commit a constitutional violation).  After May 2000 and until July 21, 2000, when she became the assigned worker instead of supervisor, there is no allegation of a specific referral made to Villareal that she ignored.  Because Villareal at all times believed Grace to be in a safe environment and believed Veronica Bogey not to be a danger to Grace, there was no basis for Villareal to make any referrals.

Johnson has not created a genuine issue of material fact whether Villareal acted in exercise of her professional judgment.  Even assuming every assertion Johnson makes to be true, and disregarding that he has not pointed the Court to facts in the record to substantiate each assertion, Johnson has, at most, created an issue of material fact whether Villareal acted negligently.  Johnson has not, by pointing to facts in the record, overcome the presumption that Villareal's decisions in this case were valid.  The Court, therefore, finds that Villareal acted in exercise of her professional judgment and is entitled to qualified immunity.

## C.   JOHNSON HAS NOT SHOWN THAT VILLAREAL CREATED THE DANGER TO GRACE

-19-

Johnson asserts that Villareal put Grace at obvious risk of serious, immediate and proximate harm "by failing to inquire about a credible report of abuse and neglecting to supervise the placement of Grace in Veronica Bogey's home in any manner[.]"   Johnson does not cite to any evidence in the record to support this claim.   The record does show that Villareal knew of Bowman's investigation result and that Villareal relied on that result.   See Villareal Depo. at 20:15-16; Villareal Aff. ¶ 27, at 6.   Both Villareal and Perez Sanchez followed up with Bowman regarding her investigation, and CYFD informed the court and Grace's guardian ad litem of the investigation and  the result.

Sanchez made visits to Veronica Bogey's home on April 3 and May 15.   See Sanchez Depo. at 65:13-20.   Sanchez also saw Grace at daycare.   See id. at 65:24-25.   Sanchez also monitored Grace through phone contacts and other professionals in the community.   See id. at 36:2-8.   Bowman saw Grace in the Bogey home during her investigation, and Villareal saw Grace in the office.   Other professionals also saw Grace.   See Villareal Aff. ¶ 22, at 5.

The record establishes that Sanchez and Villareal faced a severe limitation on resources. Villareal is a placement supervisor.   See Villareal Aff. ¶ 20, 21 at 5.   She supervised two placement social workers in Roswell (one of whom was Sanchez), one in Ruidoso, and two in Alamagordo.   See id.   Sanchez took over Grace's case on November 8, 1999.   See id. ¶ 18, at 4.   On November 27, 1999, one placement social worker in Roswell left.   See id. ¶ 21, at 5.   Sanchez then had to carry the caseload of two social workers.   See Sanchez Depo. at 28:13 - 29:10.   Sanchez could not conduct monthly home visits because she had to carry two caseloads.   See id. at 36, 37.   Sanchez left CYFD in May 2000, and Villareal had to carry the entire Roswell caseload, i.e., that of both the worker who left on November 27, 1999 and Sanchez.   She also had to do her supervision of the Alamagordo and Ruidoso workers.   See Villareal Depo. at 26-27.   As a result of time and other constraints, Villareal

-20-

felt that telephone and other contacts were an appropriate substitute for home visits.  <u>See</u> Villareal

Aff. ¶ 22, at 5.  She felt this was appropriate because there were daycare and home health care

persons having almost daily contact who could report any concerns.  <u>See id.</u>

The only suggestion of any risk to Grace was the March referral which Bowman

unsubstantiated.  Because Bowman unsubstantiated  the referral, it cannot be considered a basis for

a serious, immediate and proximate risk that Villareal ignored.  The deliberate indifference required

to defeat qualified immunity "requires a showing that the official knew of and disregarded an

excessive risk of health or safety to the claimant."  <u>Whitley v. New Mexico Children, Youth &</u>

<u>Families Dep't</u>, 184 F. Supp. 2d 1146, 1156 (D.N.M. 2001).

Unlike in <u>Currier v. Doran</u>, where a social worker failed to investigate bruises, Grace did not

have any known injuries that were not investigated.  Villareal did not have knowledge of immediate

serious risk of harm that she disregarded.  Accordingly, there was no immediate threat of harm.  <u>See</u>

<u>Ruiz v. McDonnell</u>, 299 F.3d 1173, 1183 (10th Cir. 2002) (holding that improper licensing of day

care did not create immediate threat of harm required for danger creation, and threat of indefinite

range and duration is not sufficient for danger creation).

If it were not for  the lack of resources, i.e., that Villareal carried the caseload of two social

workers in addition to her supervisory duties, then at most Johnson might make out a case of

negligent monitoring of the Bogey home.  Negligence, however, is insufficient for liability.  Villareal

exercised professional judgment in allowing monitoring of the Bogey home through some in-person

visits, telephone contacts and by relying on others visiting the home.  <u>See</u> Villareal Aff. ¶ 22, at 5.

Based on the record before the Court, Johnson has not shown a genuine issue of material fact

as to the first, third, fourth or fifth elements of a claim for state created danger.  Further, Villareal's

-21-

actions in exercising her professional judgment do not rise to the standard for conscience shocking established by the Tenth Circuit.

Whether or not conduct is conscience shocking is determined by considering three factors: "(1) the need for restraint in defining the scope of substantive due process claims; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting public safety." Ruiz v. McDonald, 299 F.3d 1173, 1183-84 (10th Cir. 2002). These factors counsel that application of danger creation as a basis for § 1983 claims is reserved for exceptional circumstances. See Currier v. Doran, 242 F.3d at 920; Ruiz v. McDonald, 299 F.3d at 1184. Ordinary negligence does not shock the conscience. See DeShaney, 489 U.S. at 202; DeAnzona v. City & County of Denver, 202 F.3d at 1236. Permitting unreasonable risks to continue is not necessarily conscience shocking. See Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995)(citing Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992)).

CYFD and the state court licensed and approved the Bogey home. CYFD informed the state court of the only referral and the conclusion of that investigation. There is no evidence Villareal, as a supervisor, took deliberate action to direct a violation or had actual knowledge. See DeAnzona v. City & County of Denver, 222 F.3d at 1234. The state court, the guardian ad litem, and Villareal, were not aware of any known risk and did not act recklessly.

> [T]he defense of qualified immunity is often asserted in the most difficult of cases. Yet it is precisely for the hard case that the immunity exists. The availability of immunity cannot be judged solely by tragedies that later occur or by mistakes that later come to light. Knowing what we know now, no child would have been placed in the care of the Bonners. But now is not then, and few mortals stand unscathed by hindsight. The question under qualified immunity is thus whether fallible and imprescient human beings acted reasonably on the law as it stood and on the facts as they were known at the time at the time the action was taken. On this record, we are unable to find that the standard of objective reasonableness applied to the actions of

public officials has been transgressed.

<u>White v. Chambliss</u>, 112 F.3d 731, 739 (4th Cir. 1997)(internal citation omitted).  While hindsight provides a heartbreaking look at what may very well have been a horrifying situation for Grace, the record in this case does not establish that Villareal created the danger resulting in Grace's death.  The Court finds that Villareal is entitled to qualified immunity and will, therefore, grant Villareal's motion for summary judgment.[6]

## II.  THE COURT NEED NOT ADDRESS WHETHER VILLAREAL IS ENTITLED TO ABSOLUTE IMMUNITY FOR HER RECOMMENDATION OR ADVICE TO THE COURT.

Johnson alleges that Villareal violated professional judgment in making recommendations to the Court.  <u>See</u> Complaint ¶ 22, at 5.  Recommendations of social workers are part of their role in preparing for, initiating and prosecuting a child abuse and neglect case. Villareal asserts that a social worker is entitled to immunity for her role in advising the Court or attorneys as to the prosecution of the case.

To determine if an official is entitled to absolute immunity, the court must determine if there was a common law counterpoint in the common law when Congress passed the Civil Rights Acted in 187.  <u>See</u> <u>Malley v. Briggs</u>, 475 U.S. 335, 340 (1986).  Even if the modern day official's position did not exist in 1871, he is still entitled to immunity if he performs functions that are analogous to functions performed by those who were immune at common law.  <u>See</u> <u>Butz v. Economou</u>, 438 U.S.

---

[6] In <u>Deanzona v. City & County of Denver</u>, 222 F.3d 1229 (10th Cir. 2000), Chief Judge Tacha held that the shock the conscience standard also applied to the special relationship exception to the <u>DeShaney</u> rule. <u>See</u> <u>id</u>. at 1236.  Because the Court has found that Villareal's alleged actions and omissions do not shock the Court's conscience this rationale provides an additional basis for dismissal of Johnson's substantive due process claim premised on a special relationship.

478, 515 (1978). Officials functioning as an integral part of the judicial process are absolutely immune under § 1983 when they perform judicial or quasi-judicial acts that are an integral part of the judicial process. See Pierson v. Ray, 386 U.S. 547, 553 (1967)(judges); Imbler v. Pachtman, 424 U.S. 409, 427 (1976)(prosecutors); Briscoe v. LaHue, 460 U.S. 325, 341 (1983) (witnesses).

The Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits have all held that social workers are entitled to absolute immunity in this role.[7] Villareal asserts that her alleged recommendation to the state court is either analogous to the function performed by prosecutors or to that of witnesses. See Meyers v. Contra Costa County Dep't of Social Servs., 812 F.2d at 1157 (holding that although social workers do not initiate proceedings, their responsibility is not very different from the responsibility of a criminal prosecutor); Briscoe v. LaHue, 460 U.S. at 341 (witness immunity). She contends that her recommendation was clearly integral to the judicial process. See NMSA 1978, § 32A-5-31B (requiring CYFD's post-placement report containing evaluation of the proposed adoption with a recommendation as to the granting of the petition).

To apply immunity, it is important to determine the precise claim upon which liability is based.

_____

[7] See Ernst v. Child & Youth Servs., 108 F.3d 486, 497 (3d Cir.), cert. denied, 522 U.S. 850 (1997)(holding that social workers have absolute immunity under functional analysis for formulation and presentation of recommendations to the Court); Vosburg v. Dep't of Social Servs., 884 F.2d 133, 135 (4th Cir. 1989) (holding that social workers are entitled to absolute immunity for functions integral to judicial process including initiation and presentation of case); Salyer v. Patrick, 874 F.2d 374, 378 (6th Cir. 1989)(holding that social workers are entitled to absolute immunity for filing abuse petition); Millspaugh v. County Dep't of Pub. Welfare of Wabash County, 937 F.2d 1172, 1176 (7th Cir. 1991) (holding that presentation of case to court is analogous to prosecutorial function entitling social worker to absolute immunity), cert. denied, 502 U.S. 1004 (1991); Meyers v. Contra Costa County Dep't of Social Servs., 812 F.2d 1154, 1156 (9th Cir. 1987), cert. denied, 484 U.S. 829 (1987)(holding that social workers are absolutely immune for decision whether to bring a proceeding). See also Pepper v. Alexander, 599 F. Supp. 523, 526 (D.N.M. 1984) (holding that a social worker is absolutely immune for decision to apply termination of parental rights and participation in that proceeding).

-24-

See Burns v. Reed, 500 U.S. 478, 487 (1991).  When the CYFD Defendants made recommendations to the state Court, they were doing so because the law  required they do so and were acting in a role akin to prosecutors:

> Although child services workers do not initiate criminal proceedings, their responsibility for bringing dependency proceedings, and their responsibility to exercise independent judgment in determining when to bring such proceedings, is not very different from the responsibility of a criminal prosecutor.  The social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children.

Contra Costa County Dep't of Social Servs., 812 F.2d at 1157.  See also Pepper v. Alexander, 599 F. Supp. 523 (D.N.M. 1984)(Bratton, J.)(holding that social workers are absolutely immune for liability for the decision  to apply for termination and for participation in that proceeding).

In  Currier v. Doran, the Tenth Circuit considered a social worker's actions in making a recommendation to the court.  See Currier v. Doran, 242 F.3d at 920 ("By failing to investigate the allegations of child abuse **and by recommending that Vargas assume legal custody**, Doran's conduct put Anthony and Latasha at obvious risk of serious, immediate, and proximate harm, a harm that Doran recklessly and consciously disregarded.")(emphasis added).  The Tenth Circuit ultimately upheld the district court's denial of qualified immunity to Doran.  See id. at 924-25.  The Tenth Circuit did not, however, address the question of absolute immunity.

It is possible to read the Tenth Circuit's decision in Currier v. Doran as precluding absolute immunity for social workers who make recommendations to the court.  Because that was not part of the ultimate holding in Currier v. Doran, this Court declines to speculate as to the Tenth Circuit's as-yet unannounced position on absolute immunity as to social work.  This Court has already found that Villareal is entitled to qualified immunity for her actions in this case, so it is unnecessary to determine

-25-

whether Villareal is also entitled to absolute immunity for her recommendations to the court.

The Defendant Villareal's Motion for Summary Judgment and Qualified Immunity Dismissing Count I and Memorandum in Support Thereof is granted.   The Court will dismiss Count I as to Defendant Virginia Villareal.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Paul Kennedy
Mary Y.C. Han
Adam S. Baker
Kennedy & Han, P.C.
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*


Tim Flynn-O'Brien
Bryan & Flynn-O'Brien
Albuquerque, New Mexico

     *Attorney for Defendants Bonnie Vehstedt, Lydia R. Saenz,*
     *Karen Zarate, and Virginia Villareal*

Randolph B. Felker
Felker, Ish, Ritchie, & Geer, P.A.
Santa Fe, New Mexico

     *Attorney for Defendants Anne Holmes, Sonia (Sanchez) Perez,*
     *Ginger Bowman, Denise H. Narvaez, Vivian Encinias,*

Jerry A. Walz
Walz and Associates
Cedar Crest, New Mexico

     *Attorneys for Defendants Veronica Bogey and Terry Bogey*


-26-

Michael Dickman
Law Office of Michael Dickman
Santa Fe, New Mexico

*Attorneys for Defendant Children, Youth, and Families Department*