IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SCOTT JOHNSON, as personal representative of
the estate of GRACIELA CANO a/k/a GRACE
LEE BOGEY, deceased, and LORENA TORREZ,

        Plaintiffs,

vs.                                                                    No. CIV 02-1239 JB/KBM

ANNE HOLMES, BONNIE VEHSTEDT,
KAREN ZARATE, LYDIA R. SAENZ, SONIA
PEREZ, VIRGINIA VILLAREAL, VIVIAN ENCINIAS,
GINGER BOWMAN, DENISE H. NARVAEZ,
JANE DOE, and JOHN DOE in their individual
capacities, the NEW MEXICO CHILDREN, YOUTH
AND FAMILIES DEPARTMENT, TERRY BOGEY,
a/k/a TERI BOGEY, and VERONICA BOGEY,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

     **THIS MATTER** comes before the Court on the Defendant Ginger Bowman's Motion for

Summary Judgment and Qualified Immunity Dismissing Count I and Memorandum in Support

Therefore.  The primary issue is whether the Defendant, Ginger Bowman, acted in exercise of her

professional judgment.  Because Bowman is entitled to qualified immunity, the Court will grant her

motion for summary judgment, and dismiss Count I against her.[1]

---

[1] The Court has previously entered an Order granting Defendant Bowman's Motion for
Summary Judgment and Qualified Immunity Dismissing Count I.  See Order, filed  March 30, 2004
(Doc. 195).  This opinion is intended to explain more fully the Court's reasoning for its previous
Order.

## FACTUAL BACKGROUND

During her involvement in this case, Bowman was a senior social worker for the New Mexico Children Youth & Families Department ("CYFD") in CYFD's Roswell Investigative Unit.  See Affidavit of Ginger Bowman ¶ 2, at 1 (executed March 19, 2003).  Bowman received the assignment to investigate a referral of possible abuse of Grace by Veronica Bogey.  See id. ¶ 3, at 1.  Bowman received only the single referral.  See id.

Bowman received credible information from health care worker Janie Mealand that Bogey was physically abusing Grace, who had suffered "cuts, bruises, [and] welts" which were "excessive/inappropriate."  APS/CPS Intake Report (signed by Bowman)(March 24, 2000).  The report was based on the first-hand observations of home health care nurse Kerstin Lagestam, who had begun to provide health care to Grace in January 2000.  See Affidavit of Kerstin Lagestam ¶ 2, at 1 (executed May 28, 2003).  During the first time that she went to Bogey's home to care for Grace, Lagestam "noticed some swelling and a large purple bruise on the left side of Grace's face. Veronica told [her] that she accidently struck Grace's face on the car door as she was lifting her out of the car."  Id. ¶ 3, at 2.  At the time, Lagestam remembers thinking that Bogey should have been more careful.  See id.

On or about March 16, 2000, Lagestam noticed a series of injuries to Grace.  See id. ¶ 5, at 2; APS/CPS Intake Report.  Specifically, Grace had some scratches on her back and deep fingernail scratches on her neck and abdomen.  See APS/CPS Intake Report.  The latter scratches appeared to be so deep as to leave scars on Grace, and in fact, according to Grace's autopsy report, they did.  See id.; Autopsy Report at 4-5 (September 3, 2000).  Lagestam "became deeply concerned, because the scratch marks were entirely inappropriate and looked like they had been intentionally inflicted."  See

-2-

Lagestam Aff ¶ 5, at 2.  Lagestam spoke with the employees at Grace's daycare to determine if Grace had been accidentally injured while playing at daycare.  See id. ¶ 6, at 2.  The employees told her that she had not been.[2]  See id.

After Janie Mealand reported the allegations of abuse to State Centralized Intake, the investigation was designated as a "priority one," requiring CYFD's response within 24 hours.  See § 8.10.2.7 NMAC (defining "priority one referral" as "any appropriate referral for which the information gathered requires a response within 24 hours from receipt of the referral").

Bowman visited Bogey's house on March 24, 2000, but Bogey was not there.  See Bowman Aff. ¶ 4, at 1; Deposition of Sonia Perez Sanchez at 45:6 to 46:2 (taken June 6, 2003).  Defendant Sonia Sanchez accompanied Bowman on her visit to Bogey's residence.  See Bowman Aff. ¶ 5, at 1; Sanchez Depo. 45:6 to 46:2.  Bowman and Sanchez worked at the same office.  See Deposition of Ginger Bowman at 6:20 to 8:7 (taken June 6, 2003).

The Plaintiffs contend that the assignment of Bowman to investigate Bogey posed a conflict of interest and failed to meet standards for professional judgment.  If Bowman substantiated the allegations of abuse, Sanchez' work and placement of Grace with Bogey would be in jeopardy.  See Affidavit of Alvin L. Sallee ¶ 4(i), at 7 (executed August 2003).

Previously, Bogey had told Sanchez that she would be taking Grace on vacation on March 25, 2000.  See Sanchez Depo. at 40:13 to 41:3.  Sanchez was not acting as an investigator, but went to the interview because she had been assigned to Bogey's case to provide pre-adoptive/post

---

[2] The Plaintiff submits this fact, not for the truth of the matter asserted, but to demonstrate the inadequacy of the investigation of the alleged abuse of Grace, during which Bowan and the other CYFD Defendants allegedly failed to interview persons regarding the specific incidents and injuries reported to them.

placement support services to Bogey.  See id.  Bowman left her CYFD business card at Bogey's home and requested Bogey to telephone her when she returned.  See Bowman Aff. ¶ 4, at 1. Bowman and Sanchez made no efforts to contact Bogey later in the day.

Bowman did not do anything to investigate the allegations of child abuse against Bogey between March 25, 2000 and April 3, 2000.  When Bogey returned to New Mexico with Grace ten days later on April 3, 2000, she telephoned Sanchez, not Bowman.  See "Running Narrative" entry (April 3, 2000)(Bates Stamp Nos. 295-96); Bowman Depo. at 12:16 to 13:7.  Sanchez told her over the telephone about the nature of the allegations against her, adding that "not all [such allegations] are substantiated" or words to that effect.  "Running Narrative" entry (April 3, 2000)(Bates Stamp 295-96).  The Plaintiffs contend that this conversation compromised the investigation's integrity.  See Sallee Aff. ¶ 4(i), at 7.  After Sanchez informed her of the allegations, Bogey told Sanchez over the telephone that, if she examined Grace, she would see scratches and bruises on her legs from her father's ferret, that it took months for Grace's bruises to heal, that Grace had bruises for over four months, and that Bogey usually put ointment on Grace's bruises to help them heal.  See "Running Narrative" entry (April 3, 2000)(Bates Stamp Nos. 295-96).

Approximately the next week, Bowman received a telephone call from Bogey and made arrangements to visit Bogey and Grace at Bogey's home.  See Bowman Aff. ¶ 4, at 1.  The parties dispute what occurred at the home visit.  Bowman contends that she thoroughly interviewed Bogey. See Bowman Aff. ¶ 6, at 1.  The Plaintiffs contend that Bowman merely asked Bogey about the bruising on Grace's hand that Mealand had reported.  See Defendant Veronica Bogey's Responses to Plaintiffs' First Set of Interrogatories, Interrogatory No. 24 (served June 23, 2003).  Bowman contends that Bogey removed Grace's clothing and that she thoroughly examined Grace's body.  See

-4-

Bowman Aff. ¶ 6, at 1.  She says that she observed no evidence of bruising or scratches and saw no evidence of scaring, scabs, or previous abuse.  See id.  She observed some "real light bruising on her shins" during the investigation.  See Bowman Depo. 13:14-16.  Bowman thought Grace seemed very attached to Bogey and appeared to relate well with her.  See id.  She did not appear to be afraid of Bogey.  See id.  In contrast, the Plaintiffs contend that substantial disputed evidence shows that Bowman did not physically examine Grace as part of her investigation.

Bogey admitted that Grace may have suffered minor scratching or bruising, but, in Bowman's opinion, Bogey made satisfactory explanations of the possible causes.  See Bowman Aff. ¶ 7, at 1-2. The Plaintiffs dispute this allegation.  The Plaintiffs contend that the investigation that Bowman and Sanchez conducted was a sham, biased and worse than useless.  See Sallee Aff. ¶ 4(i), at 7.  The Plaintiffs maintain that the only reasonable inference is that Bowman failed to conduct any physical examination of Grace.

## STANDARD FOR SUMMARY JUDGMENT WHEN A DEFENDANT HAS RAISED THE QUALIFIED IMMUNITY DEFENSE

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Once a defendant raises the qualified immunity defense, the plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged violation occurred."  Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 646 (10th Cir. 1988).  If the plaintiff meets this two-part burden, the defendant "assumes the normal

-5-

summary judgment burden of establishing that no material facts that would defeat his claim for qualified immunity remain in dispute." Woodward v. City of Worland, 977 F.2d 1392, 1396-97 (10th Cir. 1992).

In ruling on a summary judgment motion, the court examines the factual record and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  See Allen v. Muskogee, Oklahoma, 119 F.3d 837, 839-40 (10th Cir. 1997).  The court's role on a motion for summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'"  See Ulissey v. Shvartsman, 61 F.3d 805, 808 (10th Cir. 1995)(quoting Matsushuta Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(internal quotations omitted).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, at 93-95 (1983)).  "If the evidence is merely colorable, . . . or is not significantly probative," summary judgment is appropriate.  See Anderson v. Liberty Lobby, Inc. 477 U.S. at 249-50 (internal citations omitted).

-6-

## LEGAL ANALYSIS

**I.   THE PLAINTIFFS DO NOT NEED ADDITIONAL DISCOVERY UNDER RULE 56(f) BEFORE THE COURT RULES ON THIS MOTION FOR SUMMARY JUDGMENT.**

Bowman brings her motion under rule 56.  Subsection f of this rule states:

> Should it appear from the affidavits of a party opposing [a motion for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavts to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed .R. Civ. P. 56(f).  The Plaintiffs contend that, although the material factual issues set forth in the response are sufficient to defeat Bowman's motion for summary judgment, they cannot present by affidavit or otherwise all of the facts justifying their opposition to Bowman's summary judgment motion at this time.  The Plaintiffs' counsel submitted a rule 56(f) affidavit.  The Plaintiffs contend that the Court should deny Bowman's motion or, in the alternative, permit the Plaintiffs to take additional discovery before ruling on her motion.  Specifically, Johnson seeks to depose Theresa Vasquez or locate her for the purpose of obtaining a sworn affidavit reflecting her unsworn statement to law enforcement officers.  Johnson asserts that this information is probative of Veronica Bogey's attempt to hide her further abuse of Grace after she learned that allegations of abuse had been reported to the CYFD Defendants.  See Response at 9.

"The general principle of Rule 56(f) is that 'summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'"  Price v. Western Resources, Inc., 232 F.3d 779, 783 (10th Cir. 2000)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 250 n.5). Johnson has not explained why, during the discovery period that the Court allowed, he did not obtain the discovery sought in this motion.

-7-

Johnson had the right to depose Vasquez under the Stipulation on Discovery Regarding Qualified Immunity. The stipulation provided for the taking of the Depositions of Mealand, Vasquez, and others. Johnson chose not to take Vasquez' deposition and cannot now assert that he was unable to obtain this deposition. The Court will, therefore, deny Johnson's request to stay the ruling on this motion pending further discovery.

Although the Plaintiffs cite several cases in support of their request for additional discovery, they do not cite any authority for the proposition that rule 56(f) negates the protection that qualified immunity affords government officials. The Supreme Court of the United States has instructed district courts to be mindful that qualified immunity protects government officials from discovery. See Harlow v. Fitzgerald, 457 U.S. at 817-18 ("[W]e conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. . . . Until this threshold immunity question is resolved, discovery should not be allowed.").

Thus, the doctrine of qualified immunity requires courts to analyze requests for additional discovery somewhat differently than other types of cases. A district court has discretion to determine whether to allow additional discovery following the filing of a rule 56(f) affidavit and, if allowed, the rule 56(f) affidavit "should be treated liberally unless dilatory or lacking in merit." Patty Precision v. Brown & Sharpe Mfg. Co., 742 F.2d 1260, 1264 (10th Cir. 1984). However, the district court's discretion is not without bounds, particularly when the summary judgment motion is grounded on a claim of qualified immunity:

> Rule 56(f) discretion must be limited when a summary judgment motion is based on qualified immunity because insubstantial lawsuits "against government officials [should] be resolved prior to discovery and on summary judgment if possible."

-8-

> Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987). . . . Liberal application of rule 56(f) should not be allowed to subvert the goals of Harlow and its progeny.

Jones v. City and County of Denver, Colo., 854 F.2d 1206, 1211 (10th Cir. 1988). See Lewis v. City of Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990). "Rule 56(f) is not a license for a fishing expedition, especially when summary judgment is urged based on a claim of qualified immunity." Id. at 759. "[I]n response to a summary judgment motion based on qualified immunity, a plaintiff's rule 56(f) affidavit must demonstrate 'how discovery will enable them to rebut a defendant's showing of objective reasonableness' or, stated alternatively, demonstrate a 'connection between the information he would seek in discovery and the validity of the [defendant's] qualified immunity assertion.'" Id. at 758 (quoting Jones v. City and County of Denver, Colo., 854 F.2d at 1211).

Johnson's rule 56(f) affidavit does not adequately demonstrate the connection between the information sought in discovery and the validity of Bowman's qualified immunity assertion. The rule 56(f) affidavit references actions by Veronica Bogey that isolated Grace. Johnson does not explain, however, how discovery regarding Bogey's action is related to Bowman's qualified immunity claim. The Court therefore, denies Johnson's request to stay the ruling on this motion pending further discovery.

## II.   BOWMAN DID NOT VIOLATE GRACE'S ESTABLISHED CONSTITUTIONAL RIGHTS.

Count I of the Plaintiffs' Amended Complaint states a § 1983 claim against Bowman for her violation of Grace's due process rights under the fourteenth amendment. The fourteenth amendment protects citizens against state actions that deprive them of life, liberty, or property without due process of law. See U.S. Const. Amend. XIV. "[T]he right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." Youngberg v. Romero,

457 U.S. 307, 315 (1982)(citing <u>Ingraham v. Wright</u>, 430 U.S. 651, 673 (1977).

Persons in state custody have due process rights to "reasonable care and safety." <u>Id.</u> at 324. The United States Court of Appeals for the Tenth Circuit has held that this due process right to be reasonably safe while in state custody under the fourteenth amendment extends to children in foster care. <u>See</u> <u>Yvonne L. v. New Mexico Dep't of Human Servs.</u>, 959 F.2d 883, 892 (10th Cir. 1992). <u>See</u> <u>also</u> <u>Omar v. Lindsay</u>, 334 F.3d 1246, 1248 (11th Cir. 2003)(holding that foster children have a clearly established fourteenth amendment liberty interest in physical safety)(citing <u>Taylor v. Ledbetter</u>, 818 F.2d 791, 794-95 (11th Cir. 1987)); <u>K.H. v. Morgan</u>, 914 F.2d 846, 852 (7th Cir. 1990).

The due process clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 196 (1989). In <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, the minor plaintiff alleged that the state and its employees had violated his constitutional rights "by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." 489 U.S. at 193. In rejecting the claim, the Supreme Court stated:

> While the State may have been aware of the dangers that [the minor Plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of [the minor Plaintiff] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the minor Plaintiff].

<u>Id.</u> at 201. There are, however, exceptions to <u>DeShaney</u>.

-10-

First, if the state restrains an individual's freedom to act to protect himself or herself by restricting that individual's personal liberty, the state thereby enters into a special relationship during such restraint to protect that individual from the violent acts of others. See Armijo v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1261 (10th Cir. 1998). Second, state officials can be liable for the acts of third parties where those officials played a part in creating the danger that caused the harm or rendered the plaintiff more vulnerable to the harm. Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996)(quoting Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995)). The Court does not believe that these exceptions apply. DeShaney, therefore, requires summary judgment.

**A.    THE CYFD DEFENDANTS, INCLUDING BOWMAN, HAD A SPECIAL RELATIONSHIP WITH GRACE, THEREBY IMPOSING A DUTY UPON THEM TO PROTECT HER FROM THE HARM SHE SUFFERED.**

The first of the exceptions to DeShaney extends to children in the state's legal custody, given the "special relationship" between the state and such children. Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d at 893. Specifically, in Yvonne L., the Court of Appeals for the Tenth Circuit held that children in the state's legal custody have a clearly established "constitutional right to be reasonably safe from harm; and that if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to children they incur liability if the harm occurs." Id. Then, recognizing that children in the state's custody are "'entitled to more considerate treatment and conditions' than [are] criminals" under the Eight Amendment's deliberate indifference standard, the Tenth Circuit held that the standard of conduct for liability to be applied in the foster care setting is "failure to exercise professional judgment." Id. at 894 (quoting Youngberg v. Romero, 457 U.S. at 321-22).

Interpreting this standard, the Tenth Circuit determined that "[f]ailure to exercise professional

-11-

judgment . . . does not require actual knowledge the child[] will be harmed," but rather "implies abdication of the duty to act professionally . . . ."  Id.  Thus, "[i]f defendants knew of the asserted danger to plaintiff[] or failed to exercise professional judgment thereto, . . . and if an affirmative link to the injuries plaintiff[] suffered can be shown, then . . . defendants violated plaintiff['s] constitutional rights." Id. at 890.  The question is whether Yvonne L. is controlling in this case.

Bowman concedes that a special relationship existed between the State and Grace during Grace's placement in Bogey's home.  See Transcript of Hearing at 14:12 - 18.  Until the adoption was finalized on July 31, 2000, Grace remained in CYFD's legal custody.  See Decree of Adoption ¶ 3, at 1 (entered July 31, 2000).  As such, state law charged CYFD with the duties to "determine where and with whom [Grace] shall live;" and to "provide [Grace] with food, shelter, education, and ordinary and emergency medical care."  NMSA 1978, § 32A-1-4N.

In furtherance of their legal obligations to Grace, state law required the CYFD Defendants to conduct a home visit, to interview in Bogey's home, and to determine the capacity of Bogey to shelter, to feed, and to clothe Grace.  See id. at §§ 32A-5-12, 32A-5-13, 32A-5-14; NMAC 8.26.3.18 (requiring pre-placement study to include study of physical and social home environment).  Before the adoption could go through, the CYFD Defendants were under a duty to conduct a post-placement investigation to include a number of home visits so that they could make the required post-placement statement to the state court regarding the prospective adoptive home.  See NMSA 1978 §§ 32A-5-31; NMAC 8.26.3.32B.  The CYFD Defendants were also under a duty to provide post placement services to Grace until the adoption's finalization.  See NMAC 8.26.2.20.

If any of the individual CYFD Defendants suspected child abuse or neglect in the adoptive home, she was under a duty to investigate; if the investigation substantiated the suspicion, the worker

-12-

had a duty to determine the family was no longer eligible to adopt children in CYFD's custody. <u>See</u> NMAC 8.26.2.21. The relationship between the State and Grace was therefore the "special relationship" that, under <u>Yvonne L.</u>, gives rise to a duty of protection from harm.

Bowman concedes that, under the foregoing analysis, a special relationship existed between the State and Grace before the adoption, but argues that Grace's adoption on July 31, 2000 severed this special relationship. The question is whether the adoption cuts off the special relationship so that no liability can accrue say on August 1st, the day after the adoption.

Bowman's argument would have this Court ignore that the allegations that she did not exercise professional judgment in handling the child abuse investigation to which CYFD assigned her before the adoption. This failure allegedly proximately caused the increasingly violent abuse to which Bogey and her father subjected her. This abuse allegedly continued both before and after the adoption, and merely culminated in her murder on September 2, 2000.

Based on the undisputed facts before the Court, however, the Court cannot say that Bowman failed to exercise her professional judgment. Therefore, the Court need not decide whether Bowman can be held responsible for harm that started before July 31, 2000, but may not have manifested itself until after July 31, 2000, when the special relationship ended.

### B.    BOWMAN EXERCISED PROFESSIONAL JUDGMENT.

A social worker is not liable for all injuries to a child under their care, nor for negligence. <u>See</u> <u>Yvonne L.</u>, 959 P.2d at 894 (failure to exercise professional judgment does not mean mere negligence)(citing <u>Youngberg v. Romeo</u>, 457 U.S. at 323). <u>See also</u> <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 848-49 (1998)(holding that liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process). Conduct constituting negligence, gross

-13-

negligence or even malpractice does not meet the threshold requirement to establish a failure to exercise professional judgment and, thereby, violation of a constitutional right. See Yvonne L., 959 F.2d at 893-94. See also County of Sacramento v. Lewis, 523 U.S. at 848-49; Bailey v. Pacheco, 108 F.Supp.2d 1214, 1220 (D.N.M 2000); Whitley v. CYFD, 184 F.Supp.2d 1146, 1162 (D.N.M. 2001); Miracle v. Spooner, 978 F.Supp 1161, 1172 (N.D.Ga. 1997). A social worker is not liable for conduct by other social workers. Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990). In addition, failure to follow every state regulation is not a violation of the standard of professional judgment. See Bailey v. Pacheco, 108 F.Supp.2d at 1236 (failure to follow state regulations does not constitute absence of professional judgment).

A decision made by a professional is presumptively valid, and liability will be imposed only if the decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment. See Youngberg v. Romeo, 457 U.S. at 323. It is not the court's role to specify which of several professionally acceptable choices should have been made, nor should the court attempt to second guess professionals in their decision making. See id. at 321; Bailey v. Pacheco, 108 F.Supp.2d at 1221. "The material question is not whether other professional social workers might disagree with Defendants' decision, but whether Defendants abandoned their duty to act professionally." Whitley v. CYFD, 184 F.Supp.2d at 1162. "The inquiry is whether there was a failure to act professionally, not whether there was a departure from a standard of care." Id. at 1162, n.8. Moreover, "a professional in his individual capacity . . . will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability." Youngberg v. Romeo, 457 U.S. at 323.

-14-

Bowman and Sanchez received credible information from a health care worker that Bogey was physically abusing Grace.  The question is whether they met their professional obligations in handling the report.  Two weeks after learning of the reported abuse of Grace, Sanchez told Bogey that she had been accused of abusing Grace, but assured her that she probably had nothing to worry about, thereby potentially compromising the integrity of any investigation that CYFD conducted.

Additionally, the same office employed Bowman and Sanchez.  The assignment of Bowman to investigate may have posed a conflict of interest and failed to meet standards for professional judgment: if Bowman substantiated the allegations of abuse, Sanchez' placement might be in jeopardy.

Bowman visited Bogey's home.  Bowman did not, however, contact any third parties, in alleged violation of standard operating procedure.  She did not speak to Lagestam, who observed Grace's injuries, or to Grace's pediatrician.

Johnson contends that these failures in the investigation represent failure to exercise any professionalism in the investigation of child abuse.  Johnson contends that the only reasonable inference to be drawn from these facts is that Bowman did not conduct an investigation at all.  The basis for this contention is Bogey's silence on the interrogatories as to a physical investigation conducted by Bowman and Mealand's affidavit regarding scratches causing permanent scarring.

Johnson points to the autopsy report to assert scarring existed at the time of Grace's death, specifically a 1/16 inch round light tan scar on the upper right quadrant of the abdomen, that was not explainable by Grace's previous surgery for spinabifida.  There is no evidence, however,  that abuse cause this scar, nor  does the scar correlate with the multiple scratches that Mealand reported and Lagestam thought would leave permanent scars.  From these contentions, the Court cannot infer that

-15-

Bowman did not conduct an investigation.

In evaluating possible child abuse, unless there is an admission or a witness to the actual abuse, the investigator must often make the decision on whether to substantiate based upon professional judgment. Bowman explains that children are regularly observed to be bruised, scratched, or injured in some manner.  Such symptomology could be indicative of child abuse, or possibly not. Often, the most persuasive evidence is whether the custodial parent has a rational, believable explanation for the claimed neglect or abuse.  The investigative social worker's decision is usually subjective, unless there is a witness or an admission.  The failure of others in daily contact with the child to report suspected abuse, the lack of observed injuries, and a rational, reasonable explanation by the child's custodian are factors which might lead the investigator to not substantiate a referral. While in retrospect the decision to leave Grace with Bogey may appear flawed, this is not a valid basis for liability. See  White v. Chambliss, 112 F.3d 731, 739 (4th Cir. 1997); Cruz v. Hawaii, 857 F.Supp 741, 758 (D. Haw. 1994)("This court need not agree whole-heartedly with the conclusions reached by the social workers in order to rule that they are covered by qualified immunity; it need only find that they acted reasonably.").  Bowman's decision must be reviewed based on what was known then. "[N]ow is not then, and few mortals stand unscathed by hindsight."  White v. Chambliss, 112 F.3d at 739.

Bowman deemed the explanations that Bogey offered to be reasonable and rational in her professional judgment.  There were no witnesses to the any actual abuse of Grace by anyone, and Johnson has not identified any such witnesses.  Bowman may not have been able  to conduct further interviews, with Grace's doctor for example, because of  budget constraints.  The Roswell Investigative Unit, normally staffed by five investigators, only had two investigators on staff at that

-16-

time, and Bowman was handling more than twice the number of cases she should have been assigned.

Dissatisfaction with the quality of an investigation does not establish a constitutional violation. See County of Sacramento v. Lewis, 523 U.S. at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). There is no court that says that failure to carry out an investigation as skillfully as one would hope is an abrogation of professional judgment. See Transcript 1 at 23:19 - 22; White v. Chambliss, 112 F.3d at 739. While Johnson indicates there should have been further investigation, he fails to offer what further investigation would have discovered. There was nothing suspicious or indicative of danger to Grace in Bogey's behavior, the most that can be said is that she negligently examined Grace. See Transcript 1 at 47:1 to 48:1.

Johnson has not created a genuine issue of material fact that the investigation was a sham. While there was a special relationship, there is no evidence indicating Bowman failed to exercise professional judgment. Bowman did examine Grace and did make a determination. There is no evidence permitting the inference that the scratches observed in March by Lagestam and reported by Mealand would have been visible to Bowman on April 3, 2000 when she conducted her investigation. There is no evidence that Bowman intentionally delayed the investigation, or that Bowman did not conduct a physical examination. See Transcript 1 at 25:8 to 26:9. Bowman did not fail to exercise professional judgment. Therefore, the exception to DeShaney does not apply.

### C.   BOWMAN DID NOT CREATE THE DANGER FOR GRACE OR INCREASE   HER VULNERABILITY TO HARM.

The other exception to the DeShaney rule is the "danger creation" theory. The Tenth Circuit, relying on dicta in DeShaney, has recognized a claim holding state officials liable for "the acts of third

-17-

parties where those officials created the danger that caused the harm." See Currier v. Doran, 242 F.3d 905, 917-18 (10th Cir. 2001)(quoting Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996)(internal quotations omitted).

> To make out a proper danger creation claim the plaintiff must demonstrate that (i) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger is some way; (ii) plaintiff was a member of a limited and specifically definable group; (iii) defendants' conduct put plaintiff at substantial risk of serious, immediate and proximate harm; (iv) the risk was obvious or known; (v) defendants acted recklessly in conscious disregard of that risk; and (vi) such conduct, when viewed in total, is conscience shocking.

See Currier v. Duran, 242 F.3d at 918 (citing Armijo v. Wagon Mound Pub. Schs., 159 F.3d at 1262-63).

Johnson contends that (i) Bowman created the danger to Grace before legal custody was transferred to Bogey and greatly increased Grace's vulnerability to harm by mishandling the investigation, leaving Grace in the Bogey home, giving Bogey tacit approval to continue her abuse of Grace with impunity, and contributing to the State's recommendation for Grace's adoption;  (ii) Grace was a member of a limited and specifically definable group - children taken into state custody; (iii) Bowman placed Grace at obvious risk of serious, immediate, and proximate harm, which Bowman recklessly and consciously disregarded by ignoring and failing to investigate credible allegations of abuse, and failing to remove Grace from Bogey's custody when the continuation of that placement was clearly inappropriate; and (iv) Bowman's  conduct is conscience shocking when viewed in its entirety.

Bowman argues that danger creation theory focuses on affirmative actions of state workers in placing the plaintiff in danger.  Therefore, Johnson cannot rely on a failure to intervene because Bowman did not place Grace with Bogey.  Misconduct committed by state officials before the

-18-

transfer of legal custody, however, may be considered for purposes of establishing "danger creation." Currier v. Duran, 242 F.3d  at 919 &  n.6.  Although Grace was in Bogey's custody at the time of the referral investigation, Bogey did not have legal custody of Grace at the time of Bowman's investigation.  Thus, Bowman's conduct may be considered even though she did not "place" Grace with Bogey.

Johnson also argues that, in the context of a state's social work involving an abused child, the danger creation elements may be satisfied by showing that the state placed or left a child in the custody of an abuser based on a recommendation or other action by a state social worker that reflects a reckless and conscious disregard of an obvious or known substantial risk of serious, immediate, and proximate harm. See Currier v. Duran, 242 F.3d at 919-22. Bowman argues that Johnson, however, has not demonstrated that the risk was obvious or known or that Bowman acted recklessly in conscious disregard of that risk.   Bowman contends that, in her own mind, she thoroughly interviewed Bogey and thoroughly examined Grace's body, observing no evidence of bruising, scratches, scarring or signs of abuse.  Additionally, Bowman observed that Grace appeared to be very attached to Bogey.  Based on her investigation, Bowman in her professional judgment did not substantiate the referral.   Bowman filed an investigative study reporting reflecting that finding.

This Court finds that Bowman's conduct fails satisfy the elements of the danger creation theory because Bowman did not recklessly and consciously disregard an obvious risk of serious, immediate and proximate harm.  As discussed above, Bowman conducted an investigation and filed a report.  The investigation may have been inadequate, but there is no indication that Bowman consciously and recklessly disregarded Grace's safety.  Morever, Bowman's conduct, although

arguably inadequate, was not so egregious as to not shock the conscience of the Court.[3]

The Defendant Bowman's Motion for Summary Judgment and Qualified Immunity Dismissing Count I and Memorandum in Support Thereof is granted.   The Court will dismiss Count I as to Defendant Virginia Bowman.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Mary Y.C. Han
Adam S. Baker
Kennedy & Han, P.C.
Albuquerque, New Mexico

*Attorneys for the Plaintiffs*

Tim Flynn-O'Brien
Bryan & Flynn-O'Brien
Albuquerque, New Mexico

*Attorney for Defendants Bonnie Vehstedt, Lydia R. Saenz,*
*Karen Zarate, and Virginia Villareal*

Randolph B. Felker
Felker, Ish, Ritchie, & Geer, P.A.
Santa Fe, New Mexico

*Attorneys for Defendants Anne Holmes, Sonia (Sanchez) Perez,*
*Ginger Bowman, Denise H. Narvaez, and Vivian Encinias*

---

[3] In Deanzona v. City & County of Denver, 222 F.3d 1229 (10th Cir. 2000), Chief Judge Tacha held that the shock the conscience standard also applied to the special relationship exception to the DeShaney rule.  See id. at 1236.  Because the Court has found that Bowman's alleged actions and omissions do not shock the Court's conscience, this rationale provides an additional basis for dismissal of Johnson's substantive due process claim premised on a special relationship.

Jerry A. Walz
Walz and Associates
Cedar Crest, New Mexico

    *Attorney for Defendants Veronica Bogey and Terry Bogey*

Michael Dickman
Law Office of Michael Dickman
Santa Fe, New Mexico

    *Attorney for Defendant Children, Youth, and Families Department*